Rapport explicatif de
Mlle Elisa Pérez-Vera

Explanatory Report by
Elisa Pérez-Vera

TRANSLATION OF THE PERMANENT BUREAU

## Introduction

*I  Conclusions des travaux de la Conférence de La Haye de droit international privé*

1 ´ La Convention sur les aspects civils de l'enlèvement international d'enfants a été adoptée en séance plénière le 24 octobre 1980 par la Quatorzième session de la Conférence de La Haye de droit international privé, à l'unanimité des Etats présents.[1] Le 25 octobre 1980, les délégués signèrent l'Acte final de la Quatorzième session contenant le texte de la Convention et une Recommandation qui contient la formule modèle à utiliser pour les demandes de retour des enfants déplacés ou retenus illicitement.

A cette occasion, la Conférence de La Haye s'est écartée de sa pratique, les projets de Conventions adoptés au cours de la Quatorzième session ayant été ouverts à la signature des Etats immédiatement après la séance de clôture. Quatre Etats ont signé la Convention à cette occasion (le Canada, la France, la Grèce et la Suisse), de sorte qu'elle porte la date du 25 octobre 1980.

2   En ce qui concerne le point de départ des travaux qui ont abouti à l'adoption de la Convention, ainsi que les conventions existantes en la matière ou ayant un rapport direct avec elle, nous renvoyons à l'introduction du Rapport de la Commission spéciale.[2]

3   La Quatorzième session de la Conférence, qui a siégé du 6 au 25 octobre 1980, a confié l'élaboration de la Convention à sa Première commission, dont le Président était le professeur A. E. Anton (Royaume-Uni) et le Vice-président le doyen Leal (Canada); l'un et l'autre avaient déjà été respectivement Président et Vice-président de la Commission spéciale. D'autre part, le professeur Elisa Pérez-Vera a été confirmé dans ses fonctions de Rapporteur. M. Adair Dyer, Premier secrétaire au Bureau Permanent, qui avait élaboré d'importants documents pour les travaux de la Conférence, a été chargé de la direction scientifique du secrétariat.

4   Au cours de treize séances, la Première commission a procédé à une première lecture de l'avant-projet élaboré par la Commission spéciale. Simultanément, elle a nommé un Comité de rédaction qui, au fur et à mesure de la pro-

## Introduction

*I  Results of the work of the Hague Conference on private international law*

1   The Convention on the Civil Aspects of International Child Abduction was adopted on 24 October 1980 by the Fourteenth Session of the Hague Conference on private international law in Plenary Session, and by unanimous vote of the States which were present.[1] On 25 October 1980, the delegates signed the Final Act of the Fourteenth Session which contained the text of the Convention and a Recommendation containing the model form which is to be used in applications for the return of children who have been wrongfully abducted or retained.
On this occasion, the Hague Conference departed from its usual practice, draft Conventions adopted during the Fourteenth Session being made available for signature by States immediately after the Closing Session. Four States signed the Convention then (Canada, France, Greece and Switzerland), which thus bears the date 25 October 1980.

2   As regards the starting point of the proceedings which resulted in the adoption of the Convention, as well as the matter of existing conventions on the subject or those directly related to it, we shall refer to the introduction to the Report of the Special Commission.[2]

3   The Fourteenth Session of the Conference, which took place between 6 and 25 October 1980, entrusted the task of preparing the Convention to its First Commission, the Chairman of which was Professor A. E. Anton (United Kingdom) and the Vice-Chairman Dean Leal (Canada), who had already been Chairman and Vice-Chairman respectively of the Special Commission. Professor Elisa Pérez-Vera was confirmed in her position as Reporter. Mr Adair Dyer, First Secretary of the Permanent Bureau, who had prepared important documents for the Conference proceedings, was in charge of the scientific work of the secretariat.

4   In the course of thirteen sittings, the First Commission gave a first reading to the Preliminary Draft drawn up by the Special Commission. At the same time, it named the members of a Drafting Committee which drafted the text

---

[1] Allemagne, Australie, Autriche, Belgique, Canada, Danemark, Espagne, Etats-Unis, Finlande, France, Grèce, Irlande, Japon, Luxembourg, Norvège, Pays-Bas, Portugal, Royaume-Uni, Suède, Suisse, Tchécoslovaquie, Venezuela et Yougoslavie. Les Représentants de la République Arabe d'Egypte, d'Israël et de l'Italie, quoique ayant pris une part active aux travaux de la Première commission, n'ont pas participé au vote. Le Maroc, le Saint-Siège et l'Union des Républiques Socialistes Soviétiques ont envoyé des observateurs. Au cours des travaux, la Première commission a également disposé du concours précieux des observateurs du Conseil de l'Europe, du Commonwealth Secretariat et du Service Social International.

[2] Rapport de la Commission spéciale, Nos 3 et 7 à 15.

[1] Australia, Austria, Belgium, Canada, Czechoslovakia, Denmark, Finland, France, Germany, Greece, Ireland, Japan, Luxembourg, Netherlands, Norway, Portugal, Spain, Sweden, Switzerland, United Kingdom, United States, Venezuela and Yugoslavia.
Representatives of the Arab Republic of Egypt, Israel and Italy did not participate in the vote, despite having played an active part in the proceedings of the First Commission. Morocco, the Holy See and the Union of the Soviet Socialist Republics sent observers. In the course of the proceedings, the First Commission also had at its disposal the invaluable assistance of observers from the Council of Europe, the Commonwealth Secretariat and International Social Service.
[2] Report of the Special Commission, Nos 3 and 7 to 15.

gression des travaux, a mis les textes au point.[3] Sept autres séances ont été consacrées à la discussion du texte préparé par le Comité de rédaction,[4] ainsi qu'à celle des clauses visant l'application de la Convention au regard des Etats à systèmes juridiques non unifiés («*Application Clauses*») et de la formule modèle[5] rédigées par des Comités *ad hoc*.[6] Les clauses finales, suggérées par le Bureau Permanent, ont été incorporées dans l'avant-projet établi par le Comité de rédaction.

concurrently with the progress of the main proceedings.[3] Seven other sittings were devoted to a discussion of the text prepared by the Drafting Committee,[4] as well as of clauses relating to the application of the Convention to States with non-unified legal systems ('Application Clauses') and of the model form[5] drafted by *ad hoc* Committees.[6] The final clauses had been suggested by the Permanent Bureau and were incorporated into the preliminary draft Convention drawn up by the Drafting Committee.

## II  *Objet et plan du présent Rapport*

5  Le Rapport explicatif d'un texte destiné à devenir du droit positif, c'est-à-dire d'un texte qui devra être invoqué et appliqué, doit remplir au moins deux objectifs essentiels. D'une part, le Rapport doit mettre en relief aussi fidèlement que possible les principes qui sont à la base de la Convention et, quand cela s'avère nécessaire, l'évolution des idées qui ont conduit à consacrer de tels principes parmi les options existantes. Il ne s'agit certes pas de faire état d'une manière exhaustive des positions adoptées tout au long du processus d'élaboration de la Convention, mais le point de vue retenu par celle-ci sera parfois plus facile à comprendre s'il est confronté à d'autres idées avancées.

Or, étant donné que l'avant-projet de Convention préparé par la Commission spéciale a obtenu un large appui[7] et que, par conséquent, le texte définitif maintient l'essentiel de la structure et des principes fondamentaux de l'avant-projet, le présent Rapport final reprendra, surtout dans sa première partie, certains passages du Rapport de la Commission spéciale préparé en avril 1980 à l'intention de la Quatorzième session.[8]

6  Ce Rapport final doit remplir aussi un autre objectif: fournir à ceux qui auront à appliquer la Convention un commentaire détaillé de ses dispositions. Ce commentaire étant en principe destiné à éclairer la teneur littérale des dispositions conventionnelles, nous nous préoccuperons beaucoup moins d'en retracer la genèse que d'en préciser le contenu.

7  Des considérations précédentes nous pouvons conclure que les deux objectifs envisagés sont nettement différenciés et que les méthodes mêmes d'analyse utilisées pour atteindre l'un et l'autre ne peuvent pas être identiques. Toutefois, la référence dans les deux cas à un texte unique, celui de la Convention, impliquera certaines redites, qui nous semblent inévitables. En dépit de ce risque et étant donné le double objectif souligné, nous avons divisé le Rapport en deux parties: la première est consacrée à l'étude des principes généraux qui inspirent la Convention; la seconde est destinée à l'examen du texte article par article.

8  Finalement, comme le soulignait en 1977 le professeur von Overbeck,[9] il semble opportun de rappeler que ce Rapport a été établi, à l'issue de la Quatorzième session, à partir des procès-verbaux et des notes du Rapporteur. Il n'a

## II  *Aim and structure of this Report*

5  The Explanatory Report on a text which is destined to become positive law, that is to say a text which will require to be cited and applied, must fulfil at least two essential aims. On the one hand, it must throw into relief, as accurately as possible, the principles which form the basis of the Convention and, wherever necessary, the development of those ideas which led to such principles being chosen from amongst existing options. It is certainly not necessary to take exhaustive account of the various attitudes adopted throughout the period during which the Convention was being drawn up, but the point of view reflected in the Convention will sometimes be more easily grasped by being set opposite other ideas which were put forward.

Now, given the fact that the preliminary draft Convention prepared by the Special Commission enjoyed widespread support[7] and that the final text essentially preserves the structure and fundamental principles of the Preliminary Draft, this final Report and in particular its first part, repeats certain passages of the Report of the Special Commission prepared in April 1980, for the Fourteenth Session.[8]

6  This final Report must also fulfil another purpose, *viz.* to supply those who have to apply the Convention with a detailed commentary on its provisions. Since this commentary is designed in principle to throw light upon the literal terms of these provisions, it will be concerned much less with tracing their origins than with stating their content accurately.

7  We can conclude from the foregoing considerations that these two objectives must be clearly distinguished and that even the methods of analysis used cannot be the same for each of them. Nevertheless, the need to refer in both cases to the one text, that of the Convention, implies that a certain amount of repetition will be necessary and indeed inevitable. Despite this risk and in view of the emphasis which is placed on a double objective, the Report has been divided into two parts, the first being devoted to a study of the general principles underlying the Convention, the second containing an examination of the text, article by article.

8  Finally, as Professor von Overbeck emphasized in 1977,[9] it would be as well to remember that this Report was prepared at the end of the Fourteenth Session, from the *procès-verbaux* and the Reporter's notes. Thus it has not

---

[3] Le Comité de rédaction, sous la présidence de M. Leal en tant que Vice-président de la Première commission, comprenait MM. Savolainen (Finlande), Chatin (France), Jones (Royaume-Uni) et le Rapporteur. M. Dyer et plusieurs des secrétaires rédacteurs lui ont fourni un concours extrêmement précieux.
[4] Doc. trav. Nos 45, 66, 75, 78, 79 et 83.
[5] Doc. trav. No 39, complété par la proposition du Secrétariat contenue dans le Doc. trav. No 71. Le Sous-comité «*Application Clauses*» a décidé de ne pas changer la teneur des articles élaborés à ce sujet par la Commission spéciale (P.-v. No 12).

[6] Le Sous-comité «Formule-modèle», sous la présidence du professeur Müller-Freienfels (République fédérale d'Allemagne), comprenait MM. Deschenaux (Suisse), Hergen (Etats-Unis), Barbosa (Portugal), Minami (Japon) et Mlle Pripp (Suède). Le Sous-comité «*Application Clauses*», présidé par M. van Boeschoten (Pays-Bas), était formé par MM. Hétu (Canada), Hjorth (Danemark), Creswell (Australie), Salem (Egypte) et Mlle Selby (Etats-Unis).
[7] Voir notamment les *Observations des Gouvernements*, Doc. prél. No 7.
[8] Doc. prél. No 6.
[9] Rapport explicatif de la Convention sur la loi applicable aux régimes matrimoniaux, *Actes et documents de la Treizième session*, tome II, p. 329.

[3] The Drafting Committee, under the chairmanship of Mr Leal as Vice-Chairman of the First Commission, included Messrs Savolainen (Finland), Chatin (France), Jones (United Kingdom) and the Reporter. Mr Dyer and several recording secretaries provided the Committee with extremely valuable assistance.
[4] Working Documents Nos 45, 66, 75, 78, 79 and 83.
[5] Working Document No 39, supplemented by the proposal of the Secretariat in Working Document No 71. The Subcommittee on 'Application Clauses' decided against changing the terms of the articles on this topic which had been prepared by the Special Commission (*Procès-verbal* No 12).
[6] The 'Model Forms' Subcommittee, under the chairmanship of Professor Müller-Freienfels (Federal Republic of Germany), included Messrs Deschenaux (Switzerland), Hergen (United States), Barbosa (Portugal), Minami (Japan) and Miss Pripp (Sweden). The Subcommittee on 'Application Clauses', chaired by Mr van Boeschoten (Netherlands), was made up of Messrs Hétu (Canada), Hjorth (Denmark), Creswell (Australia), Salem (Egypt) and Miss Selby (United States).
[7] See in particular the *Observations of Governments*, Prel. Doc. No 7.
[8] Prel. Doc. No 6.
[9] Explanatory Report on the Convention on the Law Applicable to Matrimonial Property Regimes, *Acts and Documents of the Thirteenth Session*, Book II, p. 329.

---

donc pas été approuvé par la Conférence et il est possible que, malgré les efforts faits par le Rapporteur pour rester objectif, certains passages répondent à une appréciation partiellement subjective.

## Première partie – Caractères généraux de la Convention

9 La Convention reflète, dans son ensemble, un compromis entre deux conceptions, partiellement différentes, du but à atteindre. On perçoit, en effet, dans les travaux préparatoires, la tension existant entre le désir de protéger les situations de fait altérées par le déplacement ou le non-retour illicites d'un enfant et le souci de garantir surtout le respect des rapports juridiques pouvant se trouver à la base de telles situations. A cet égard, l'équilibre consacré par la Convention est assez fragile. D'une part, il est clair que la Convention ne vise pas le fond du droit de garde (article 19); mais d'autre part il est également évident que le fait de qualifier d'illicite le déplacement ou le non-retour d'un enfant est conditionné par l'existence d'un droit de garde qui donne un contenu juridique à la situation modifiée par les actions que l'on se propose d'éviter.

## I   OBJET DE LA CONVENTION

10   Le titre de ce chapitre fait allusion tant au problème auquel répond la Convention, qu'aux objectifs qu'elle a adoptés pour lutter contre le développement des enlèvements. Après avoir abordé ces deux points, nous traiterons d'autres questions connexes qui nuancent sensiblement la portée des objectifs visés; il s'agit en particulier de l'importance accordée à l'intérêt de l'enfant et des exceptions possibles au retour immédiat des enfants déplacés ou retenus illicitement.

### A   Délimitation du sujet

11   En ce qui concerne la délimitation du sujet,[10] nous nous limiterons à rappeler très brièvement que les situations envisagées découlent de l'utilisation de voies de fait pour créer des liens artificiels de compétence judiciaire internationale, en vue d'obtenir la garde d'un enfant. La diversité des circonstances qui peuvent concourir dans un cas d'espèce fait échouer toute tentative d'établir une définition plus précise d'un point de vue juridique. Cependant, deux éléments se font jour de façon inéluctable dans toutes les situations examinées et confirment la caractérisation approximative que l'on vient d'ébaucher.

12   En premier lieu, dans toutes les hypothèses nous nous trouvons confrontés au déplacement d'un enfant hors de son milieu habituel, où il se trouvait confié à une personne physique ou morale qui exerçait sur lui un droit légitime de garde. Bien entendu, il faut assimiler à une telle situation le refus de réintégrer l'enfant dans son milieu, après un séjour à l'étranger consenti par la personne qui exerçait la garde. Dans les deux cas, la conséquence est en effet la même: l'enfant a été soustrait à l'environnement familial et social dans lequel sa vie se déroulait. D'ailleurs, dans ce contexte, peu importe la nature du titre juridique qui était à la base de

---

[10] Voir notamment *Questionnaire et Rapport sur l'enlèvement international d'un enfant par un de ses parents*, établi par M. Adair Dyer, Doc. prél. No 1, août 1977, *supra*, p. 18-25 (cité par la suite, «Rapport Dyer»), et Rapport sur l'avant-projet de Convention adopté par la Commission spéciale, Doc. prél. No 6, mai 1980, *supra*, p. 172-173.

## First Part – General characteristics of the Convention

9   The Convention reflects on the whole a compromise between two concepts, different in part, concerning the end to be achieved. In fact one can see in the preliminary proceedings a potential conflict between the desire to protect factual situations altered by the wrongful removal or retention of a child, and that of guaranteeing, in particular, respect for the legal relationships which may underlie such situations. The Convention has struck a rather delicate balance in this regard. On the one hand, it is clear that the Convention is not essentially concerned with the merits of custody rights (article 19), but on the other hand it is equally clear that the characterization of the removal or retention of a child as wrongful is made conditional upon the existence of a right of custody which gives legal content to a situation which was modified by those very actions which it is intended to prevent.

## I   OBJECT OF THE CONVENTION

10   The title of this chapter alludes as much to the problem addressed by the Convention as to the objectives by which it seeks to counter the increase in abductions. After tackling both of these points, we shall deal with other connected questions which appreciably affect the scope of the Convention's objectives, and in particular the importance which has been placed on the interest of the child and on the possible exceptions to the rule requiring the prompt return of children who have been wrongfully removed or retained.

### A   Definition of the Convention's subject-matter

11   With regard to the definition of the Convention's subject-matter,[10] we need only remind ourselves very briefly that the situations envisaged are those which derive from the use of force to establish artificial jurisdictional links on an international level, with a view to obtaining custody of a child. The variety of different circumstances which can combine in a particular case makes it impossible to arrive at a more precise definition in legal terms. However, two elements are invariably present in all cases which have been examined and confirm the approximate nature of the foregoing characterization.

Firstly, we are confronted in each case with the removal from its habitual environment of a child whose custody had been entrusted to and lawfully exercised by a natural or legal person. Naturally, a refusal to restore a child to its own environment after a stay abroad to which the person exercising the right of custody had consented must be put in the same category. In both cases, the outcome is in fact the same: the child is taken out of the family and social environment in which its life has developed. What is more, in this context the type of legal title which underlies the exercise of custody rights over the child matters little, since

---

[10] See in particular the *Questionnaire and Report on international child abduction by one parent*, prepared by Mr Adair Dyer, Prel. Doc. No 1, August 1977, *supra*, pp. 18-25 (hereafter referred to as the 'Dyer Report'), and the Report on the preliminary draft Convention, adopted by the Special Commission, Prel. Doc. No 6, May 1980, *supra*, pp. 172-173.

---

l'exercice du droit de garde sur la personne de l'enfant: de ce point de vue, l'existence ou l'absence d'une décision relative à la garde ne change en rien les données sociologiques du problème.

13  En second lieu, la personne qui déplace l'enfant (ou qui est responsable du déplacement, quand l'action matérielle est exécutée par un tiers) a l'espoir d'obtenir des autorités du pays où l'enfant a été emmené le droit de garde sur celui-ci. Il s'agit donc de quelqu'un qui appartient au cercle familial de l'enfant, au sens large du terme; en fait, dans la plupart des cas, la personne en question est le père ou la mère.

14  Il est fréquent que la personne qui retient l'enfant essaie d'obtenir qu'une décision judiciaire ou administrative de l'Etat de refuge légalise la situation de fait qu'elle vient de créer; mais si elle n'est pas sûre du sens de la décision, il est aussi possible qu'elle opte pour l'inactivité, laissant ainsi l'initiative à la personne dépossédée. Or, même si cette dernière agit rapidement, c'est-à-dire même si elle évite la consolidation dans le temps de la situation provoquée par le déplacement de l'enfant, l'enleveur se trouvera dans une position avantageuse, car c'est lui qui aura choisi le for qui va juger de l'affaire, un for que, par principe, il considère comme le plus favorable à ses prétentions.

15  En conclusion, nous pouvons affirmer que le problème dont s'occupe la Convention — avec tout ce qu'implique de dramatique le fait qu'il concerne directement la protection de l'enfance dans les relations internationales — prend toute son acuité juridique par la possibilité qu'ont les particuliers d'établir des liens plus ou moins artificiels de compétence judiciaire. En effet, par ce biais, le particulier peut altérer la loi applicable et obtenir une décision judiciaire qui lui soit favorable. Certes, une telle décision, surtout quand elle coexiste avec d'autres décisions de contenu contradictoire rendues par d'autres fors, aura une validité géographiquement restreinte, mais en tout état de cause elle apportera un titre juridique suffisant pour «légaliser» une situation de fait qu'aucun des systèmes juridiques en présence ne souhaitait.

## B  Les objectifs de la Convention

16  Les objectifs de la Convention, qui apparaissent dans l'article premier, pourraient être résumés comme suit: étant donné qu'un facteur caractéristique des situations considérées réside dans le fait que l'enleveur prétend que son action soit légalisée par les autorités compétentes de l'Etat de refuge, un moyen efficace de le dissuader est que ses actions se voient privées de toute conséquence pratique et juridique. Pour y parvenir, la Convention consacre en tout premier lieu, parmi ses objectifs, le rétablissement du *status quo*, moyennant le «retour immédiat des enfants déplacés ou retenus illicitement dans tout Etat contractant». Les difficultés insurmontables rencontrées pour fixer conventionnellement des critères de compétence directe en la matière[11] ont en effet conduit au choix de cette voie qui, bien que détournée, va, dans la plupart des cas, permettre que la décision finale sur la garde soit prise par les autorités de la résidence habituelle de l'enfant, avant son déplacement.

17  D'ailleurs, bien que l'objectif exprimé au point *b*, «faire respecter effectivement dans les autres Etats contractants les

whether or not a decision on custody exists in no way alters the sociological realities of the problem.

Secondly, the person who removes the child (or who is responsible for its removal, where the act of removal is undertaken by a third party) hopes to obtain a right of custody from the authorities of the country to which the child has been taken. The problem therefore concerns a person who, broadly speaking, belongs to the family circle of the child; indeed, in the majority of cases, the person concerned is the father or mother.

14  It frequently happens that the person retaining the child tries to obtain a judicial or administrative decision in the State of refuge, which would legalize the factual situation which he has just brought about. However, if he is uncertain about the way in which the decision will go, he is just as likely to opt for inaction, leaving it up to the dispossessed party to take the initiative. Now, even if the latter acts quickly, that is to say manages to avoid the consolidation through lapse of time of the situation brought about by the removal of the child, the abductor will hold the advantage, since it is he who has chosen the forum in which the case is to be decided, a forum which, in principle, he regards as more favourable to his own claims.

15  To conclude, it can firmly be stated that the problem with which the Convention deals — together with all the drama implicit in the fact that it is concerned with the protection of children in international relations — derives all of its legal importance from the possibility of individuals establishing legal and jurisdictional links which are more or less artificial. In fact, resorting to this expedient, an individual can change the applicable law and obtain a judicial decision favourable to him. Admittedly, such a decision, especially one coexisting with others to the opposite effect issued by the other forum, will enjoy only a limited geographical validity, but in any event it bears a legal title sufficient to 'legalize' a factual situation which none of the legal systems involved wished to see brought about.

## B  The objectives of the Convention

16  The Convention's objects, which appear in article 1, can be summarized as follows: since one factor characteristic of the situations under consideration consists in the fact that the abductor claims that his action has been rendered lawful by the competent authorities of the State of refuge, one effective way of deterring him would be to deprive his actions of any practical or juridical consequences. The Convention, in order to bring this about, places at the head of its objectives the restoration of the *status quo*, by means of 'the prompt return of children wrongfully removed to or retained in any Contracting State'. The insurmountable difficulties encountered in establishing, within the framework of the Convention, directly applicable jurisdictional rules[11] indeed resulted in this route being followed which, although an indirect one, will tend in most cases to allow a final decision on custody to be taken by the authorities of the child's habitual residence prior to its removal.

17  Besides, although the object stated in sub-paragraph *b*, 'to ensure that rights of custody and of access under the law

---

[11]  Une telle option a été rejetée au cours de la première réunion de la Commission spéciale. *Cf. Conclusions des discussions de la Commission spéciale de mars 1979 sur le kidnapping légal*, établies par le Bureau Permanent, Doc. prél. No 5, juin 1979, *supra*, p. 163-164.

[11]  Such an option was rejected in the course of the first meeting of the Special Commission. *Cf. Conclusions drawn from the discussions of the Special Commission of March 1979 on legal kidnapping*, prepared by the Permanent Bureau, Prel. Doc. No 5, June 1979, *supra*, pp. 163-164.

---

droits de garde et de visite existant dans un Etat con-
tractant», présente un caractère autonome, sa connexion
téléologique avec l'objectif «retour de l'enfant» n'en est pas
moins évidente. En réalité, on pourrait estimer qu'il ne s'agit
que d'un seul objectif considéré à deux moments différents:
tandis que le retour immédiat de l'enfant répond au désir de
rétablir une situation que l'enleveur a modifiée unilatérale-
ment par une voie de fait, le respect effectif des droits de
garde et de visite se place sur un plan préventif, dans la
mesure où ce respect doit faire disparaître l'une des causes
les plus fréquentes de déplacements d'enfants.
Or, puisque la Convention ne précise pas les moyens que
chaque Etat doit employer pour faire respecter le droit de
garde existant dans un autre Etat contractant, il faut con-
clure qu'exception faite de la protection indirecte, qui
implique l'obligation de retourner l'enfant à celui qui en
avait la garde, le respect du droit de garde échappe presque
entièrement au domaine conventionnel. Par contre, le droit
de visite fait l'objet d'une régulation incomplète certes, mais
indicative de l'intérêt accordé aux contacts réguliers entre
parents et enfants, même quand la garde a été confiée à un
seul des parents ou à un tiers.

18  Si on admet le bien-fondé des considérations
précédentes, il faut en conclure que toute tentative de
hiérarchisation des objectifs de la Convention ne peut avoir
qu'une signification symbolique. En effet, il semble presque
impossible d'établir une hiérarchisation entre deux objectifs
qui prennent leurs racines dans une même préoccupation.
Car, en définitive, il revient à peu près au même de faciliter
le retour d'un enfant déplacé ou de prendre les mesures
nécessaires pour éviter un tel déplacement.
Or, comme nous le verrons par la suite, l'aspect que la
Convention a essayé de régler en profondeur est celui du
retour des enfants déplacés ou retenus illicitement. La
raison nous semble évidente: c'est après la retenue illicite
d'un enfant que se produisent les situations les plus
douloureuses, celles qui, tout en exigeant des solutions par-
ticulièrement urgentes, ne peuvent pas être résolues de
façon unilatérale par chaque système juridique concerné.
Prises dans leur ensemble, toutes ces circonstances justifient
à notre avis le développement que la réglementation du
retour de l'enfant reçoit dans la Convention et en même
temps accordent, sur le plan des principes, une certaine
priorité à l'objectif visé. Ainsi donc, bien qu'en théorie les
deux objectifs mentionnés doivent être placés sur un même
plan, dans la pratique c'est le désir de garantir le rétablisse-
ment de la situation altérée par l'action de l'enleveur qui a
prévalu dans la Convention.

19  Dans un dernier effort de clarification des objectifs de
la Convention, il convient de souligner qu'ainsi qu'il résulte
en particulier des dispositions de son article premier, elle ne
cherche pas à régler le problème de l'attribution du droit de
garde. Sur ce point, le principe non explicite sur lequel
repose la Convention est que la discussion sur le fond de
l'affaire, c'est-à-dire sur le droit de garde contesté, si elle se
produit, devra être engagée devant les autorités
compétentes de l'Etat où l'enfant avait sa résidence
habituelle avant son déplacement; et cela aussi bien si le
déplacement a eu lieu avant qu'une décision sur la garde ait
été rendue — situation dans laquelle le droit de garde violé
s'exerçait ex lege — que si un tel déplacement s'est produit
en violation d'une décision préexistante.

C  Importance accordée à l'intérêt de l'enfant

20  Avant tout, il est nécessaire de justifier les raisons qui
nous amènent à insérer l'examen de ce point dans le con-
texte des considérations sur l'objet de la Convention. Elles
apparaissent clairement si l'on considère, d'une part que

of one Contracting State are effectively respected in the
other Contracting States' appears to stand by itself, its
teleological connection with the 'return of the child' object is
no less evident. In reality, it can be regarded as one single
object considered at two different times; whilst the prompt
return of the child answers to the desire to re-establish a
situation  unilaterally and forcibly altered by the abductor,
effective respect for rights of custody and of access belongs
on the preventive level, in so far as it must lead to the
disappearance of one of the most frequent causes of child
abductions.
Now, since the Convention does not specify the means to be
employed by each State in bringing about respect for rights
of custody which exist in another Contracting State, one
must conclude that, with the exception of the indirect means
of  protecting  custody  rights  which  is  implied   by  the
obligation to return the child to the holder of the right of
custody, respect for custody rights falls almost entirely
outwith the scope of the Convention. On the other hand,
rights of access form the subject of a rule which, although
undoubtedly incomplete, nevertheless is indicative of the
interest shown in ensuring regular contact between parents
and children, even when custody has been entrusted to one
of the parents or to a third party.

18  If the preceding considerations are well-founded, it
must be concluded that any attempt to establish a hierarchy
of objects of the Convention could have only a symbolic
significance. In fact, it would seem almost impossible to
create a hierarchy as between two objects which spring from
the same concern. For at the end of the day, promoting the
return of the child or taking the measures necessary to avoid
such removal amount to almost the same thing.

Now, as will be seen below, the one matter which the Con-
vention has tried to regulate in any depth is that of the return
of children wrongfully removed or retained. The reason for
this seems clear: the most distressing situations arise only
after the unlawful retention of a child and they are situations
which, while requiring particularly urgent solutions, cannot
be resolved unilaterally by any one of the legal systems
concerned. Taken as a whole, all these circumstances justify,
in our opinion, the Convention's development of rules for
regulating the return of the child, whilst at the same time
they give in principle a certain priority to that object. Thus,
although theoretically the two above-mentioned objects
have to be placed on the same level, in practice the desire to
guarantee the re-establishment of the status quo  disturbed
by the actions of the abductor has prevailed in the Conven-
tion.

19  In a final attempt to clarify the objects of the Conven-
tion, it would be advisable to underline the fact that, as is
shown particularly in the provisions of article 1, the Con-
vention does not seek to regulate the problem of the award
of custody rights. On this matter, the Convention rests
implicitly upon the principle that any debate on the merits
of the question, i.e. of custody rights, should take place
before the competent authorities in the State where the child
had its habitual residence prior to its removal; this applies as
much to a removal which occurred prior to any decision on
custody being taken — in which case the violated custody
rights were exercised ex lege — as to a removal in breach of a
pre-existing custody decision.

C  Importance attached to the interest of the child

20  Above all, one has to justify the reasons for including
an examination of this matter within the context of a con-
sideration of the Convention's objects. These reasons will
appear clearly if one considers, on the one hand, that the

l'intérêt de l'enfant est souvent invoqué à ce sujet, et d'autre part que l'on pourrait argumenter que l'objectif conventionnel touchant au retour de l'enfant devrait toujours être subordonné à la prise en considération de son intérêt.

21  A cet égard, il a été à juste titre mis en relief que «la norme juridique reposant sur «l'intérêt supérieur de l'enfant» est, à première vue, d'une telle imprécision qu'elle ressemble davantage à un paradigme social qu'à une norme juridique concrète. Comment étoffer cette notion pour décider quel est l'intérêt *final* de l'enfant sans faire des suppositions qui ne prennent leur source que dans le contexte moral d'une culture déterminée? En introduisant le mot «final» dans l'équation, on fait aussitôt naître de sérieux problèmes, puisque l'énoncé général de la norme ne permet pas de savoir clairement si «l'intérêt» de l'enfant qu'il faut protéger est celui qui suit immédiatement à décision, ou celui de son adolescence, de son existence de jeune adulte, de son âge mûr ou de sa vieillesse».[12]

22  D'autre part, on ne doit pas oublier que c'est en invoquant «l'intérêt supérieur de l'enfant» que souvent, dans le passé, les juridictions internes ont accordé finalement la garde en litige à la personne qui l'avait déplacé ou retenu illicitement. Il a pu se trouver que cette décision soit la plus juste; nous ne pouvons cependant pas ignorer le fait que le recours, par des autorités internes, à une telle notion implique le risque de traduire des manifestations du particularisme culturel, social, etc., d'une communauté nationale donnée et donc, au fond, de porter des jugements de valeur subjectifs sur l'autre communauté nationale d'où l'enfant vient d'être arraché.

23  Pour les motifs invoqués, parmi d'autres, la partie dispositive de la Convention ne contient aucune allusion explicite à l'intérêt de l'enfant en tant que critère correcteur de l'objectif conventionnel qui vise à assurer le retour immédiat des enfants déplacés ou retenus illicitement. Cependant, il ne faudrait pas déduire de ce silence que la Convention ignore le paradigme social qui proclame la nécessité de prendre en considération l'intérêt des enfants pour régler tous les problèmes les concernant. Bien au contraire, dès le préambule, les Etats signataires déclarent être «profondément convaincus que l'intérêt de l'enfant est d'une importance primordiale pour toute question relative à sa garde»; c'est précisément dans cette conviction qu'ils ont élaboré la Convention, «désirant protéger l'enfant, sur le plan international, contre les effets nuisibles d'un déplacement ou d'un non-retour illicites».

24  Ces deux paragraphes du préambule reflètent assez clairement quelle a été la philosophie de la Convention à cet égard, philosophie que l'on pourrait définir comme suit: la lutte contre la multiplication des enlèvements internationaux d'enfants doit toujours être inspirée par le désir de protéger les enfants, en se faisant l'interprète de leur véritable intérêt. Or, parmi les manifestations les plus objectives de ce qui constitue l'intérêt de l'enfant figure le droit de ne pas être déplacé ou retenu au nom de droits plus ou moins discutables sur sa personne. En ce sens, il est souhaitable de rappeler la Recommandation 874 (1979) de l'Assemblée parlementaire du Conseil de l'Europe dont le premier principe général dit que «les enfants ne doivent plus être considérés comme la propriété de leurs parents, mais être reconnus comme des individus avec leurs droits et leurs besoins propres».[13]

interests of the child are often invoked in this regard, and on the other hand, that it might be argued that the Convention's object in securing the return of the child ought always to be subordinated to a consideration of the child's interests.

21  In this regard, one fact has rightly been highlighted, *viz.* that 'the legal standard 'the best interests of the child' is at first view of such vagueness that it seems to resemble more closely a sociological paradigm than a concrete juridical standard. How can one put flesh on its bare bones without delving into the assumptions concerning the *ultimate* interests of a child which are derived from the moral framework of a particular culture? The word 'ultimate' gives rise to immediate problems when  it is inserted into the equation since the general statement of the standard does not make it clear whether the 'interests' of the child to be served are those of the immediate aftermath of the decision, of the adolescence of the child, of young adulthood, maturity, senescence or old age'.[12]

22  On the other hand, it must not be forgotten that it is by invoking 'the best interests of the child' that internal jurisdictions have in the past often finally awarded the custody in question to the person who wrongfully removed or retained the child. It can happen that such a decision is the most just, but we cannot ignore the fact that recourse by internal authorities to such a notion involves the risk of their expressing particular cultural, social etc. attitudes which themselves derive from a given national community and thus basically imposing their own subjective value judgments upon the national community from which the child has recently been snatched.

23  For these reasons, among others, the dispositive part of the Convention contains no explicit reference to the interests of the child to the extent of their qualifying the Convention's stated object, which is to secure the prompt return of children who have been wrongfully removed or retained. However, its silence on this point ought not to lead one to the conclusion that the Convention ignores the social paradigm which declares the necessity of considering the interests of children in regulating all the problems which concern them. On the contrary, right from the start the signatory States declare themselves to be 'firmly convinced that the interests of children are of paramount importance in matters relating to their custody'; it is precisely because of this conviction that they drew up the Convention, 'desiring to protect children internationally from the harmful effects of their wrongful removal or retention'.

24  These two paragraphs in the preamble reflect quite clearly the philosophy of the Convention in this regard. It can be defined as follows: the struggle against the great increase in international child abductions must always be inspired by the desire to protect children and should be based upon an interpretation of their true interests. Now, the right not to be removed or retained in the name of more or less arguable rights concerning its person is one of the most objective examples of what constitutes the interests of the child. In this regard it would be as well to refer to Recommendation 874(1979) of the Parliamentary Assembly of the Council of Europe, the first general principle of which states that 'children must no longer be regarded as parents' property, but must be recognised as individuals with their own rights and needs'.[13]

---

[12] Rapport Dyer, *supra*, p. 22-23.
[13] Assemblée parlementaire du Conseil de l'Europe. 31ème Session ordinaire, *Recommandation relative à une Charte européenne des droits de l'enfant*. Texte adopté le 4 octobre 1979.

[12] Dyer Report, *supra*, pp. 22-23.
[13] Parliamentary Assembly of the Council of Europe. 31st Ordinary Session, *Recommendation on a European Charter on the Rights of the Child*. Text adopted on 4 October 1979.

---

*Rapport Pérez-Vera*

En effet, comme l'a souligné M. Dyer, dans la littérature consacrée à l'étude de ce problème, «l'opinion qu'on y trouve le plus souvent exprimée est que la véritable victime d'un «enlèvement d'enfant» est l'enfant lui-même. C'est lui qui pâtit de perdre brusquement son équilibre, c'est lui qui subit le traumatisme d'être séparé du parent qu'il avait toujours vu à ses côtés, c'est lui qui ressent les incertitudes et les frustrations qui découlent de la nécessité de s'adapter à une langue étrangère, à des conditions culturelles qui ne lui sont pas familières, à de nouveaux professeurs et à une famille inconnue».[14]

25    Il est donc légitime de soutenir que les deux objectifs de la Convention — l'un préventif, l'autre visant la réintégration immédiate de l'enfant dans son milieu de vie habituel — répondent dans leur ensemble à une conception déterminée de «l'intérêt supérieur de l'enfant». Cependant, même dans l'optique choisie, il fallait admettre que le déplacement d'un enfant peut parfois être justifié par des raisons objectives touchant soit à sa personne, soit à l'environnement qui lui était le plus proche. De sorte que la Convention reconnaît certaines exceptions à l'obligation générale assumée par les Etats d'assurer le retour immédiat des enfants déplacés ou retenus illicitement. Pour la plupart, ces exceptions ne sont que des manifestations concrètes du principe trop imprécis qui proclame que l'intérêt de l'enfant est le critère vecteur en la matière.

26    D'ailleurs, la réglementation du droit de visite répond aussi au souci de fournir aux enfants des rapports familiaux aussi complets que possible, afin de favoriser un développement équilibré de leur personnalité. Pourtant, ici encore les avis ne sont pas unanimes, ce qui met une fois de plus en relief le caractère ambigu du principe de l'intérêt de l'enfant. En effet, à l'encontre du critère admis par la Convention, certaines tendances soutiennent qu'il est préférable pour l'enfant de ne pas avoir de contacts avec ses deux parents quand le couple est séparé *de jure* ou *de facto*. A cet égard, la Conférence a été consciente du fait qu'une telle solution peut parfois s'avérer la plus souhaitable. Tout en sauvegardant la marge d'appréciation des circonstances concrètes inhérente à la fonction judiciaire, la Conférence a néanmoins préféré l'autre option et la Convention fait prévaloir sans équivoque l'idée que le droit de visite est la contrepartie naturelle du droit de garde; contrepartie qui, par conséquent, doit en principe être reconnue à celui des parents qui n'a pas la garde de l'enfant.

D    *Exceptions à l'obligation d'assurer le retour immédiat des enfants*

27    Etant donné que le retour de l'enfant est en quelque sorte l'idée de base de la Convention, les exceptions à l'obligation générale de l'assurer constituent un aspect important pour en comprendre avec exactitude la portée. Il ne s'agit évidemment pas d'examiner ici en détail les dispositions qui établissent ces exceptions, mais d'en esquisser le rôle, en insistant particulièrement sur les raisons qui ont déterminé leur inclusion dans la Convention. De ce point de vue, nous pouvons distinguer des exceptions basées sur trois justifications différentes.

28    D'une part, l'article 13*a* reconnaît que les autorités judiciaires ou administratives de l'Etat requis ne sont pas

In fact, as Mr Dyer has emphasized, in the literature devoted to a study of this problem, 'the presumption generally stated is that the true victim of the 'childnapping' is the child himself, who suffers from the sudden upsetting of his stability, the traumatic loss of contact with the parent who has been in charge of his upbringing, the uncertainty and frustration which come with the necessity to adapt to a strange language, unfamiliar cultural conditions and unknown teachers and relatives'.[14]

25    It is thus legitimate to assert that the two objects of the Convention — the one preventive, the other designed to secure the immediate reintegration of the child into its habitual environment — both correspond to a specific idea of what constitutes the 'best interests of the child'. However, even when viewing from this perspective, it has to be admitted that the removal of the child can sometimes be justified by objective reasons which have to do either with its person, or with the environment with which it is most closely connected. Therefore the Convention recognizes the need for certain exceptions to the general obligations assumed by States to secure the prompt return of children who have been unlawfully removed or retained. For the most part, these exceptions are only concrete illustrations of the overly vague principle whereby the interests of the child are stated to be the guiding criterion in this area.

26    What is more, the rule concerning access rights also reflects the concern to provide children with family relationships which are as comprehensive as possible, so as to encourage the development of a stable personality. However, opinions differ on this, a fact which once again throws into relief the ambiguous nature of this principle of the interests of the child. In fact, there exists a school of thought opposed to the test which has been accepted by the Convention, which maintains that it is better for the child not to have contact with both parents where the couple are separated in law or in fact. As to this, the Conference was aware of the fact that such a solution could sometimes prove to be the most appropriate. Whilst safeguarding the element of judicial discretion in individual cases, the Conference nevertheless chose the other alternative, and the Convention upholds unequivocally the idea that access rights are the natural counterpart of custody rights, a counterpart which must in principle be acknowledged as belonging to the parent who does not have custody of the child.

D    *Exceptions to the duty to secure the prompt return of children*

27    Since the return of the child is to some extent the basic principle of the Convention, the exceptions to the general duty to secure it form an important element in understanding the exact extent of this duty. It is not of course necessary to examine in detail the provisions which constitute these exceptions, but merely to sketch their role in outline, while at the same time stressing in particular the reasons for their inclusion in the Convention. From this vantage point can be seen those exceptions which derive their justification from three different principles.

28    On the one hand, article 13*a* accepts that the judicial or administrative authorities of the requested State are not

---

[14] Rapport Dyer, *supra*, p. 21.

[14] Dyer Report, *supra*, p. 21.

tenues d'ordonner le retour de l'enfant lorsque le demandeur n'exerçait pas de façon effective, avant le déplacement prétendûment illicite, la garde qu'il invoque maintenant, ou lorsqu'il a donné son accord postérieur à l'action qu'il attaque désormais. Il s'agit par conséquent des situations dans lesquelles, ou bien les conditions préalables au déplacement ne comportaient pas l'un des éléments essentiels des relations que la Convention entend protéger (celui de l'exercice effectif de la garde), ou bien le comportement postérieur du parent dépossédé montre une acceptation de la nouvelle situation ainsi créée, ce qui la rend plus difficilement contestable.

29  D'autre part, les alinéas 1*b* et 2 du même article 13 retiennent des exceptions s'inspirant clairement de la prise en considération de l'intérêt de l'enfant. Or, comme nous l'avons signalé auparavant, la Convention a donné un contenu précis à cette notion. Ainsi, l'intérêt de l'enfant de ne pas être déplacé de sa résidence habituelle, sans garanties suffisantes de stabilité de la nouvelle situation, cède le pas devant l'intérêt primaire de toute personne de ne pas être exposée à un danger physique ou psychique, ou placée dans une situation intolérable.

30  De surcroît, la Convention admet aussi que l'avis de l'enfant sur le point essentiel de son retour ou de son non-retour puisse être décisif, si d'après les autorités compétentes il a atteint un âge et une maturité suffisante. Par ce biais, la Convention donne aux enfants la possibilité de se faire l'interprète de leur propre intérêt. Evidemment, cette disposition peut devenir dangereuse si son application se traduit par des interrogatoires directs de jeunes qui peuvent, certes, avoir une conscience claire de la situation, mais qui peuvent aussi subir des dommages psychiques sérieux s'ils pensent qu'on les a obligés à choisir entre leurs deux parents. Pourtant, une disposition de ce genre était indispensable étant donné que le domaine d'application de la Convention *ratione personae* s'étend aux enfants jusqu'à leur seizième anniversaire; il faut avouer que serait difficilement acceptable le retour d'un enfant, par exemple de quinze ans, contre sa volonté. D'ailleurs, sur ce point précis, les efforts faits pour se mettre d'accord sur un âge minimum à partie duquel l'opinion de l'enfant pourrait être prise en considération ont échoué, tous les chiffres ayant un caractère artificiel, voire arbitraire; il est apparu préférable de laisser l'application de cette clause à la sagesse des autorités compétentes.

31  En troisième lieu, il n'existe pas d'obligation de faire revenir l'enfant quand, aux termes de l'article 20, ceci «ne serait pas permis par les principes fondamentaux de l'Etat requis sur la sauvegarde des droits de l'homme et des libertés fondamentales». Nous nous trouvons ici devant une disposition peu habituelle dans les conventions concernant le droit international privé et dont la portée exacte est difficile à établir. En renvoyant au commentaire de l'article 20 pour tenter d'y parvenir, il nous paraît surtout intéressant ici d'en considérer l'origine. Or cette règle est le produit d'un compromis entre délégations favorables et délégations contraires à l'inclusion dans la Convention d'une clause d'ordre public.
Une telle possibilité a été largement débatue au sein de la Première commission, sous des formules différentes. Finalement, après quatre scrutins négatifs et par une seule voix de différence, la Commission a admis la possibilité de rejeter la demande en retour de l'enfant, avec mention d'une réserve faisant état de l'exception d'ordre public sous une formule restreinte en relation avec le droit de la famille et de l'enfance de l'Etat requis. La réserve prévue était formulée littéralement comme suit: «*Contracting States may reserve the right not to return the child when such return would be manifestly incompatible with the fundamental principles of the*

bound to order the return of the child if the person requesting its return was not actually exercising, prior to the allegedly unlawful removal, the rights of custody which he now seeks to invoke, or if he had subsequently consented to the act which he now seeks to attack. Consequently, the situations envisaged are those in which either the conditions prevailing prior to the removal of the child do not contain one of the elements essential to those relationships which the Convention seeks to protect (that of the actual exercise of custody rights), or else the subsequent behaviour of the dispossessed parent shows his acceptance of the new situation thus brought about, which makes it more difficult for him to challenge.

29  On the other hand, paragraphs 1*b* and 2 of the said article 13 contain exceptions which clearly derive from a consideration of the interests of the child. Now, as we pointed out above, the Convention invests this notion with definite content. Thus, the interest of the child in not being removed from its habitual residence without sufficient guarantees of its stability in the new environment, gives way before the primary interest of any person in not being exposed to physical or psychological danger or being placed in an intolerable situation.

30  In addition, the Convention also provides that the child's views concerning the essential question of its return or retention may be conclusive, provided it has, according to the competent authorities, attained an age and degree of maturity sufficient for its views to be taken into account. In this way, the Convention gives children the possibility of interpreting their own interests. Of course, this provision could prove dangerous if it were applied by means of the direct questioning of young people who may admittedly have a clear grasp of the situation but who may also suffer serious psychological harm if they think they are being forced to choose between two parents. However, such a provision is absolutely necessary given the fact that the Convention applies, *ratione personae*, to all children under the age of sixteen; the fact must be acknowledged that it would be very difficult to accept that a child of, for example, fifteen years of age, should be returned against its will. Moreover, as regards this particular point, all efforts to agree on a minimum age at which the views of the child could be taken into account failed, since all the ages suggested seemed artificial, even arbitrary. It seemed best to leave the application of this clause to the discretion of the competent authorities.

31  Thirdly, there is no obligation to return a child when, in terms of article 20, its return 'would not be permitted by the fundamental principles of the requested State relating to the protection of human rights and fundamental freedoms'. Here, we are concerned with a provision which is rather unusual in conventions involving private international law, and the exact scope of which is difficult to define. Although we shall refer to the commentary on article 20 for the purpose of defining such scope, it is particularly interesting to consider its origins here. This rule was the result of a compromise between those delegations which favoured, and those which were opposed to, the inclusion in the Convention of a 'public policy' clause.
The inclusion of such a clause was debated at length by the First Commission, under different formulations. Finally, after four votes against inclusion, the Commission accepted, by a majority of only one, that an application for the return of a child could be refused, by reference to a reservation which took into account the public policy exception by way of a restrictive formula concerning the laws governing the family and children in the requested State. The reservation provided for was formulated exactly as follows: '*Contracting States may reserve the right not to return the child when such return would be manifestly incompatible with the*

---

*law relating to the family and children in the State addressed»*.[15] En adoptant ce texte, on ouvrait une brèche grave dans le *consensus* qui avait présidé fondamentalement jusqu'alors aux travaux de la Conférence; c'est pourquoi, conscientes de la fait et de qu'il fallait trouver une solution largement acceptable, toutes les délégations se sont engagées dans cette voie qui constituait le chemin le plus sûr pour garantir la réussite de la Convention.

32   Le point débattu était particulièrement important, car il reflétait en partie deux conceptions partiellement différentes de l'objectif de la Convention en matière de retour de l'enfant. En effet, jusqu'ici le texte élaboré par la Première commission (en accord avec l'avant-projet préparé par la Commission spéciale) avait limité les exceptions possibles au retour de l'enfant à la considération des situations de fait et de la conduite des parties ou à une appréciation spécifique de l'intérêt de l'enfant. Par contre, la réserve qu'on venait d'accepter impliquait qu'on admettait la possibilité de refuser le retour d'un enfant sur la base d'arguments purement juridiques, tirés du droit interne de l'Etat requis. Droit interne qui aurait pu jouer dans le contexte de la disposition transcrite, soit pour «évaluer» le titre invoqué par le parent dépossédé, soit pour apprécier le bien-fondé juridique de l'action de l'enleveur. Or, de telles conséquences altéraient considérablement un édifice conventionnel construit sur l'idée qu'il fallait éviter le détournement, par voies de fait, de la compétence normale des autorités de la résidence habituelle de l'enfant.

33   Dans cette situation, l'adoption par une majorité[16] rassurante de la formule qui figure à l'article 20 de la Convention représente un louable effort de compromis entre les différentes positions, le rôle accordé à la loi interne de l'Etat de refuge ayant considérablement diminué. D'une part, la référence aux principes fondamentaux concernant la sauvegarde des droits de l'homme et des libertés fondamentales porte sur un secteur du droit où il existe de nombreux compromis internationaux. D'autre part, la règle de l'article 20 va également plus loin que les formules traditionnelles de la clause d'ordre public en ce qui concerne le degré d'incompatibilité existant entre le droit invoqué et l'action envisagée; en effet, pour pouvoir refuser le retour de l'enfant en invoquant le motif qui figure dans cette disposition, l'autorité en question doit constater non seulement l'existence d'une contradiction, mais aussi le fait que les principes protecteurs des droits de l'homme interdisent le retour demandé.

34   Pour clore ces considérations sur les problèmes traités à cet alinéa, il semble nécessaire de souligner que les exceptions de trois types au retour de l'enfant doivent être appliquées en tant que telles. Cela implique avant tout qu'elles doivent être interprétées restrictivement si l'on veut éviter que la Convention devienne lettre morte. En effet, la Convention repose dans sa totalité sur le rejet unanime du phénomène des déplacements illicites d'enfants et sur la conviction que la meilleure méthode pour les combattre, au niveau international, est de ne pas leur reconnaître des conséquences juridiques. La mise en pratique de cette méthode exige que les Etats signataires de la Convention soient convaincus de ce qu'ils appartiennent, malgré leurs différences, à une même communauté juridique au sein de laquelle les autorités de chaque Etat reconnaissent que les autorités de l'un d'entre eux — celles de la résidence

fundamental principles of the law relating to the family and children in the State addressed'.[15] The adoption of this text caused a serious breach in the consensus which basically had prevailed up to this point in the Conference proceedings. That is why all the delegations, aware of the fact that a solution commanding wide acceptance had to be found, embarked upon this road which provided the surest guarantee of the success of the Convention.

32   The matter under debate was particularly important since to some extent it reflected two partly different concepts concerning the Convention's objects as regards the return of the child. Actually, up to now the text drawn up by the First Commission (like the Preliminary Draft drawn up by the Special Commission) had limited the possible exceptions to the rule concerning the return of the child to a consideration of factual situations and of the conduct of the parties or to a specific evaluation of the interests of the child. On the other hand, the reservation just accepted implicitly permitted the possibility of the return of a child being refused on the basis of purely legal arguments drawn from the internal law of the requested State, an internal law which could come into play in the context of the quoted provision either to 'evaluate' the right claimed by the dispossessed parent or to assess whether the action of the abductor was well-founded in law. Now, such consequences would alter considerably the structure of the Convention which is based on the idea that the forcible denial of jurisdiction ordinarily possessed by the authorities of the child's habitual residence should be avoided.

33   In this situation, the adoption by a comforting majority[16] of the formula which appears in article 20 of the Convention represents a laudable attempt to compromise between opposing points of view, the role given to the internal law of the State of refuge having been considerably diminished. On the one hand, the reference to the fundamental principles concerning the protection of human rights and fundamental freedoms relates to an area of law in which there are numerous international agreements. On the other hand, the rule in article 20 goes further than the traditional formulation of 'public policy' clauses as regards the extent of incompatibility between the right claimed and the action envisaged. In fact, the authority concerned, in order to be able to refuse to order the return of the child by invoking the grounds which appear in this provision, must show not only that such a contradiction exists, but also that the protective principles of human rights prohibit the return requested.

34   To conclude our consideration of the problems with which this paragraph deals, it would seem necessary to underline the fact that the three types of exception to the rule concerning the return of the child must be applied only so far as they go and no further. This implies above all that they are to be interpreted in a restrictive fashion if the Convention is not to become a dead letter. In fact, the Convention as a whole rests upon the unanimous rejection of this phenomenon of illegal child removals and upon the conviction that the best way to combat them at an international level is to refuse to grant them legal recognition. The practical application of this principle requires that the signatory States be convinced that they belong, despite their differences, to the same legal community within which the authorities of each State acknowledge that the authorities of one of them — those of the child's habitual residence — are in

---

[15] Voir P.-v. No 9 et Doc. trav. connexes.
[16] Le texte a été adopté par 14 suffrages positifs, 6 négatifs et 4 abstentions, voir P.-v. No 13.

---

[15] See *P.-v.* No 9 and associated Working Documents.
[16] The text was adopted by 14 votes in favour, 6 against and 4 abstentions, see *P.-v.* No 13.

habituelle de l'enfant — sont en principe les mieux placées pour statuer en toute justice sur les droits de garde et de visite. De sorte qu'une invocation systématique des exceptions mentionnées, substituant ainsi au for de la résidence de l'enfant le for choisi par l'enleveur, fera s'écrouler tout l'édifice conventionnel, en le vidant de l'esprit de confiance mutuelle qui l'a inspiré.

principle best placed to decide upon questions of custody and access. As a result, a systematic invocation of the said exceptions, substituting the forum chosen by the abductor for that of the child's residence, would lead to the collapse of the whole structure of the Convention by depriving it of the spirit of mutual confidence which is its inspiration.

## II   NATURE DE LA CONVENTION

### A   *Une convention de coopération entre autorités*

35   En délimitant les buts poursuivis par les Etats contractants, les objectifs d'une convention en déterminent en dernier ressort la nature. Ainsi, la Convention sur les aspects civils de l'enlèvement international d'enfants est avant tout une convention qui cherche à éviter les déplacements internationaux d'enfants en instituant une coopération étroite entre les autorités judiciaires et administratives des Etats contractants. Une telle collaboration porte sur les deux objectifs que nous venons d'examiner, d'une part l'obtention du retour immédiat de l'enfant dans le milieu d'où il a été éloigné, d'autre part le respect effectif des droits de garde et de visite existant dans un des Etats contractants.

36   Cette caractérisation de la Convention peut aussi être effectuée à travers une approche négative. Ainsi, nous pouvons constater avant tout qu'il ne s'agit pas d'une convention sur la loi applicable à la garde des enfants. En effet, les références faites au droit de l'Etat de la résidence habituelle de l'enfant ont une portée restreinte, puisque le droit en question n'est pris en considération que pour établir le caractère illicite du déplacement (par exemple, à l'article 3). En second lieu, la Convention n'est pas non plus un traité sur la reconnaissance et l'exécution des décisions en matière de garde. On a sciemment évité cette option, qui a pourtant suscité de longs débats au sein de la première réunion de la Commission spéciale. Etant donné les conséquences sur le fond de la reconnaissance d'une décision étrangère, cette institution est normalement entourée de garanties et d'exceptions qui peuvent prolonger la procédure. Or, en cas de déplacement d'un enfant, le facteur temps prend une importance décisive. En effet, les troubles psychologiques que l'enfant peut subir du fait d'un tel déplacement pourraient se reproduire si la décision sur son retour n'était adoptée qu'après un certain délai.

37   Une fois acquis que nous nous trouvons devant une convention axée sur l'idée de coopération entre autorités, il faut préciser qu'elle n'essaie de régler que les situations entrant dans son domaine d'application et touchant deux ou plusieurs Etats parties. En effet, l'idée d'une convention «universaliste» (c'est-à-dire dont le domaine s'applique à toute espèce internationale) est difficile à soutenir en dehors des conventions en matière de loi applicable. En ce sens, nous devons rappeler que les systèmes prévus, qu'il s'agisse du retour des enfants ou d'assurer l'exercice effectif du droit de visite, s'appuient largement sur une coopération entre les Autorités centrales reposant sur des droits et des devoirs réciproques. De même, quand des particuliers s'adressent directement aux autorités judiciaires ou administratives d'un Etat contractant en invoquant la Convention, l'application des bénéfices conventionnels répond aussi à une idée de réciprocité qui exclut en principe son extension aux ressortissants des Etats tiers.

Par ailleurs, bien que la Convention n'atteigne la plénitude de ses objectifs qu'entre les Etats contractants, les autorités de chacun de ces Etats ont parfaitement le droit de s'inspirer

## II   NATURE OF THE CONVENTION

### A   *A convention of co-operation among authorities*

35   By defining the ends pursued by the Contracting States, a convention's objects in the final analysis determine its nature. Thus, the Convention on the Civil Aspects of International Child Abduction is above all a convention which seeks to prevent the international removal of children by creating a system of close co-operation among the judicial and administrative authorities of the Contracting States. Such collaboration has a bearing on the two objects just examined, *viz.* on the one hand, obtaining the prompt return of the child to the environment from which it was removed, and on the other hand the effective respect for rights of custody and access which exist in one of the Contracting States.

36   This description of the Convention can also be drawn in a negative way. Thus, it can be said at the outset that the Convention is not concerned with the law applicable to the custody of children. In fact, the references to the law of the State of the child's habitual residence are of limited significance, since the law in question is taken into consideration only so as to establish the wrongful nature of the removal (see, for example, article 3). Secondly, the Convention is certainly not a treaty on the recognition and enforcement of decisions on custody. This option, which gave rise to lengthy debates during the first meeting of the Special Commission, was deliberately rejected. Due to the substantive consequences which flow from the recognition of a foreign judgment, such a treaty is ordinarily hedged around by guarantees and exceptions which can prolong the proceedings. Now, where the removal of a child is concerned, the time factor is of decisive importance. In fact, the psychological problems which a child may suffer as a result of its removal could reappear if a decision on its return were to be taken only after some delay.

37   Once it is accepted that we are dealing with a convention which is centred upon the idea of co-operation amongst authorities, it must also be made clear that it is designed to regulate only those situations that come within its scope and which involve two or more Contracting States. Indeed, the idea of a 'universalist' convention (*i.e.* a convention which applies in every international case) is difficult to sustain outwith the realm of conventions on applicable law. In this regard, we must remember that the systems which have been designed either to return children or to secure the actual exercise of access rights, depend largely on co-operation among the Central Authorities, a co-operation which itself rests upon the notion of reciprocal rights and duties. In the same way, when individuals, by invoking the provisions of the Convention, apply directly to the judicial or administrative authorities of a Contracting State, the applicability of the Convention's benefits will itself depend on the concept of reciprocity which in principle excludes its being extended to nationals of third countries.

What is more, although the Convention attains its objectives in full only as among the Contracting States, the authorities in each of those States have the absolute right to be guided

---

des dispositions conventionnelles pour traiter d'autres situations similaires.

### B    Caractère autonome de la Convention

38    Axée comme elle l'est sur la notion de coopération entre autorités, en vue d'atteindre des objectifs précis, la Convention est autonome par rapport aux conventions existantes en matière de protection des mineurs ou relatives au droit de garde. Ainsi, l'une des premières décisions prises par la Commission spéciale a été d'orienter ses travaux dans le sens d'une convention indépendante, plutôt que d'élaborer un protocole à la *Convention de La Haye du 5 octobre 1961 concernant la compétence des autorités et la loi applicable en matière de protection des mineurs.* Dans cette même optique, elle ne pouvait pas non plus s'en tenir aux modèles proposés par les conventions sur la reconnaissance et l'exécution des décisions en matière de garde, y compris celui de la Convention du Conseil de l'Europe.[17]

39    Cette autonomie ne signifie pas que les dispositions prétendent régler tous les problèmes posés par les enlèvements internationaux d'enfants. Bien au contraire, dans la mesure où les objectifs de la Convention, quoique ambitieux, ont une portée très concrète, le problème du fond du droit de garde se situe hors du domaine d'application de la Convention. Elle est donc appelée à coexister inévitablement avec les règles sur la loi applicable et sur la reconnaissance et l'exécution des décisions étrangères de chaque Etat contractant, indépendamment du fait que leur source soit interne ou conventionnelle.
D'autre part, même dans son domaine propre, la Convention ne prétend pas être appliquée de façon exclusive: elle désire, avant tout, la réalisation des objectifs conventionnels et reconnaît donc explicitement la possibilité d'invoquer, simultanément à la Convention, toute autre règle juridique qui permette d'obtenir le retour d'un enfant déplacé ou retenu illicitement, ou l'organisation d'un droit de visite (article 34).

### C    Rapports avec d'autres conventions

40    La Convention se présente comme un instrument devant apporter une solution d'urgence, en vue d'éviter la consolidation juridique des situations, initialement illicites, provoquées par le déplacement ou le non-retour d'un enfant. Dans la mesure où elle n'essaie pas de trancher sur le fond des droits des parties, sa compatibilité avec d'autres conventions s'impose. Néanmoins, une telle compatibilité ne pouvait être obtenue qu'en assurant l'application prioritaire des dispositions susceptibles de fournir une solution d'urgence et, dans une certaine mesure, provisoire. C'est en effet après le retour de l'enfant à sa résidence habituelle que devront être soulevées, devant les tribunaux compétents, les questions relatives au droit de garde. A ce sujet, l'article 34 déclare que «dans les matières auxquelles elle s'applique, la Convention prévaut sur la *Convention du 5 octobre 1961 concernant la compétence des autorités et la loi applicable en matière de protection des mineurs*, entre les Etats parties aux deux Conventions». D'ailleurs, étant donné qu'on a essayé d'éviter que l'on puisse ajourner l'application des dispositions conventionnelles en invoquant des dispositions qui touchent le fond du droit de garde, le principe incorporé à l'article 34 devrait s'étendre à toute

by the provisions of the Convention when dealing with other, similar situations.

### B    The autonomous nature of the Convention

38    The Convention, centred as it is upon the notion of co-operation among authorities with a view to attaining its stated objects, is autonomous as regards existing conventions concerning the protection of minors or custody rights. Thus, one of the first decisions taken by the Special Commission was to direct its proceedings towards the drawing up of an independent convention, rather than the preparation of a protocol to the *Hague Convention of 5 October 1961 concerning the powers of authorities and the law applicable to the protection of minors.* Seen from this perspective, the Convention could not possibly be confined within the framework provided by the conventions on the recognition and enforcement of custody decisions, including that of the Council of Europe Convention.[17]

39    This autonomous character does not mean that the provisions purport to regulate all the problems arising out of international child abductions. On the contrary, to the extent that the Convention's aims, although ambitious, are given concrete expression, the basic problem of custody rights is not to be found within the scope of the Convention. The Convention must necessarily coexist with the rules of each Contracting State on applicable law and on the recognition and enforcement of foreign decrees, quite apart from the fact that such rules are derived from internal law or from treaty provisions.
On the other hand, even within its own sphere of application, the Convention does not purport to be applied in an exclusive way. It seeks, above all, to carry into effect the aims of the Convention and so explicitly recognizes the possibility of a party invoking, along with the provisions of the Convention, any other legal rule which may allow him to obtain the return of a child wrongfully removed or retained, or to organize access rights (article 34).

### C    Relations with other conventions

40    The Convention is designed as a means for bringing about speedy solutions so as to prevent the consolidation in law of initially unlawful factual situations, brought about by the removal or retention of a child. In as much as it does not seek to decide upon the merits of the rights of parties, its compatibility with other conventions must be considered. Nonetheless, such compatibility can be achieved only by ensuring that priority is given to those provisions which are likely to bring about a speedy and, to some extent, temporary solution. In fact it is only after the return of the child to its habitual residence that questions of custody rights will arise before the competent tribunals. On this point, article 34 states that 'This Convention shall take priority in matters within its scope over the *Convention of 5 October 1961 concerning the powers of authorities and the law applicable in respect of the protection of minors*, as between Parties to both Conventions.' Moreover, since one is trying to avoid delays in the application of the Convention's provisions caused by claims concerning the merits of custody rights, the principle in article 34 ought to be extended to any provision which has a bearing upon custody rights, whatever the reason. On the other hand, as has just been emphasized in the preceding

---

[17]  Il s'agit de la *Convention européenne sur la reconnaissance et l'exécution des décisions en matière de garde des enfants et sur le rétablissement de la garde des enfants*, adoptée par le Comité des Ministres du Conseil de l'Europe le 30 novembre 1979 et ouverte à la signature des Etats membres, au Luxembourg, le 20 mai 1980.

[17]  The *European Convention on Recognition and Enforcement of Decisions Concerning Custody of Children and on Restoration of Custody of Children*, adopted by the Committee of Ministers of the Council of Europe on 30 November 1979 and opened for signing by the Member States at Luxemburg on 20 May 1980.

disposition portant sur le droit de garde, quelle qu'en soit la source. Par contre, comme nous venons de le souligner au paragraphe précédent, les parties peuvent faire appel à toute règle qui facilite la réalisation des objectifs conventionnels.

paragraph, the parties may have recourse to any rule which promotes the realization of the Convention's aims.

### D  Ouverture de la Convention aux Etats non-membres de la Conférence de La Haye

### D  Opening of the Convention to States not Members of the Hague Conference

41   Sur ce point aussi, la Convention s'est manifestée en tant que Convention de coopération, en déterminant son caractère semi-ouvert. En principe, tout Etat pourra adhérer à la Convention, mais son adhésion «n'aura d'effet que dans les rapports entre l'Etat adhérant et les Etats contractants qui auront déclaré accepter cette adhésion» (article 38). En agissant de la sorte, les Etats contractants ont cherché à maintenir l'équilibre nécessaire entre le désir d'universalisme et la conviction qu'un système de coopération n'est efficace que lorsqu'il existe entre les Parties un degré de confiance mutuelle suffisant.

Plus encore, le choix du système de l'acceptation explicite de l'adhésion par chaque Etat membre, afin que celle-ci devienne effective à leur égard,[18] de préférence au système, plus ouvert, qui entend que l'adhésion produit ses effets sauf dans les rapports avec l'Etat membre qui s'y oppose dans un délai fixé,[19] montre l'importance accordée par les Etats à la sélection de ses cocontractants dans la matière qui fait l'objet de la Convention.

41   On this point also, by virtue of the decision that it be of a 'semi-open' type, the Convention is shown to be one of co-operation. In principle, any State can accede to the Convention, but its accession 'will have effect only as regards the relations between the acceding State and such Contracting States as will have declared their acceptance of the accession' (article 38). The Contracting States, by this means, sought to maintain the requisite balance between a desire for universality and the belief that a system based on co-operation could work only if there existed amongst the Contracting Parties a   sufficient degree of mutual confidence.

What is more, the choice of a system based on the express acceptance of accession by each Member State, by which such acceptance becomes effective as amongst themselves,[18] in preference to a more open system by which accession has effect except as regards Member States which raise objections thereto within a certain period of time,[19] demonstrates the importance which the States attached to the selection of their co-signatories in those questions which form the subject-matter of the Convention.

### III   INSTRUMENTS D'APPLICATION DE LA CONVENTION

### III   INSTRUMENTS FOR APPLYING THE CONVENTION

### A   Les Autorités centrales

### A   The Central Authorities

42   Une convention de coopération comme celle qui nous occupe peut en principe s'orienter dans deux directions différentes: imposer la coopération directe entre les autorités internes compétentes dans le domaine d'application de la Convention, ou baser son action sur la création d'Autorités centrales dans chaque Etat contractant, en vue de coordonner et de canaliser la coopération souhaitée. L'avant-projet mis au point par la Commission spéciale consacrait assez nettement le choix fait en faveur de la deuxième option et la Convention elle-même continue à être bâtie, dans une large mesure, sur l'intervention et les compétences des Autorités centrales.

42   A convention based on co-operation such as the one which concerns us here can in theory point in two different directions; it can impose direct co-operation among competent internal authorities, in the sphere of the Convention's application, or it can act through the creation of Central Authorities in each Contracting State, so as to co-ordinate and 'channel' the desired co-operation. The Preliminary Draft drawn up by the Special Commission expressed  quite clearly the choice made in favour of the second option, and the Convention itself was also built in large measure upon the intervention and powers of Central Authorities.

43   Néanmoins, l'admission sans équivoque de la possibilité reconnue aux particuliers de s'adresser directement aux autorités judiciaires ou administratives compétentes dans l'application de la Convention (article 29), accroît l'importance du devoir qui est fait à celles-ci de coopérer, à tel point qu'on pourra qualifier de «système mixte» le système suivi par la Convention du fait qu'en marge des obligations des Autorités centrales, il en introduit d'autres qui sont propres aux autorités judiciaires ou administratives.

43   Nevertheless, the unequivocal acceptance of the possibility for individuals to apply directly to the judicial or administrative authorities which have power to apply the provisions of the Convention (article 29), increases the importance of the duty of co-operation laid upon them, so much so that the system adopted by the Convention could be characterized as a 'mixed system', due to the fact that, aside from the duties imposed upon the Central Authorities, it creates other obligations which are peculiar to judicial or administrative authorities.

44   D'ailleurs, ce serait une erreur de prétendre construire une convention pour lutter contre les enlèvements internationaux d'enfants sans tenir compte du rôle important joué par les autorités judiciaires ou administratives internes dans toutes les questions concernant la protection des mineurs.

44   What is more, it would be a mistake to claim to have constructed a convention to counter international child abduction without taking account of the important role played by the internal judicial or administrative authorities in all matters concerning the protection of minors. In this context,

---

[18] A l'instar de l'article 39 de la *Convention sur l'obtention des preuves à l'étranger en matière civile ou commerciale, du 18 mars 1970*, voir P.-v. No 13.
[19] Système consacré, parmi d'autres, dans la *Convention tendant à faciliter l'accès international à la justice*, adopté également au cours de la Quatorzième session de la Conférence.

[18] As in article 39 of the *Convention of 18 March 1970 on the Taking of Evidence Abroad in Civil or Commercial Matters*, see P.-v. No 13.
[19] The system adopted, among others, by the *Convention on International Access to Justice*, also adopted during the Fourteenth Session of the Conference.

---

Dans ce contexte, la référence aux autorités administratives doit être comprise comme le simple reflet du fait que, certains Etats membres de la Conférence, cette tâche est confiée à des autorités d'une telle nature, tandis que dans la plupart des systèmes juridiques la compétence en la matière appartient aux autorités judiciaires. Somme toute, c'est aux autorités chargées à l'intérieur de chaque Etat de statuer sur la garde et la protection des enfants que la Convention confie le soin de trancher les problèmes posés, qu'il s'agisse du retour d'un enfant déplacé ou retenu illicitement, ou de l'organisation de l'exercice du droit de visite. Ainsi, la Convention fait sienne l'exigence de sécurité juridique qui inspire dans ce domaine tous les droits internes. En effet, quoique les décisions sur le retour des enfants ne préjugent pas du fond du droit de garde (voir article 19), elles vont largement influencer la vie des enfants; l'adoption de telles décisions, la prise d'une semblable responsabilité doivent obligatoirement revenir aux autorités qui sont normalement compétentes selon le droit interne.

45   Cependant, dans ses grandes lignes et dans une large majorité des cas, l'application de la Convention dépendra du fonctionnement des instruments qu'elle-même instituera à cette fin, c'est-à-dire des Autorités centrales. En ce qui concerne leur réglementation par la Convention, la première remarque à faire est que la Conférence a eu conscience des différences profondes existant dans l'organisation interne des Etats membres; c'est la raison pour laquelle la Convention ne précise point quelles doivent être la structure et la capacité d'action des Autorités centrales, deux aspects qui seront nécessairement régis par la loi interne de chaque Etat contractant. L'acceptation de cette prémisse se traduit dans la Convention par la reconnaissance du fait que les tâches assignées en particulier aux Autorités centrales pourront être accomplies soit directement par elles-mêmes, soit avec le concours d'un intermédiaire (article 7). Il est évident, par exemple, que la localisation d'un enfant peut requérir l'intervention de la police; de même, l'adoption de mesures provisoires ou l'introduction de procédures judiciaires sur des rapports privés peuvent tomber hors des compétences susceptibles d'être dévolues aux autorités administratives par certaines lois internes. Néanmoins, dans tous les cas, l'Autorité centrale reste le destinataire des obligations que la Convention lui impose, en tant que «monteur» de la coopération voulue pour lutter contre les déplacements illicites d'enfants. D'autre part, c'est encore pour tenir compte des particularités des différents systèmes juridiques que la Convention admet que l'Autorité centrale pourra exiger que la demande qui lui est adressée soit accompagnée d'une autorisation «par écrit lui donnant le pouvoir d'agir pour le compte du demandeur, ou de désigner un représentant habilité à agir en son nom» (article 28).

46   Par ailleurs, la Convention, suivant une tradition bien établie de la Conférence de La Haye,[20] dispose que tant les Etats fédéraux que les Etats plurilégislatifs ou ayant des organisations territoriales autonomes sont libres de désigner plus d'une Autorité centrale. Pourtant, les problèmes constatés dans l'application pratique des conventions qui prévoient l'existence de plusieurs Autorités centrales sur le territoire d'un seul Etat, ainsi que, tout particulièrement, les caractéristiques spéciales de la matière qui fait l'objet de la présente Convention, ont amené la Conférence, suivant le critère déjà établi par la Commission spéciale, à faire un pas

references to administrative authorities must be understood as a simple reflection of the fact that, in certain Member States, the task in question is entrusted to such authorities, while in the majority of legal systems jurisdiction belongs to the judicial authorities. *In fine*, it is for the appropriate authorities within each State to decide questions of custody and protection of minors; it is to them that the Convention has entrusted the responsibility of solving the problems which arise, whether they involve the return of a child wrongfully removed or retained or organizing the exercise of access rights. Thus, the Convention adopts the demand for legal certainty which inspires all internal laws in this regard. In fact, although decisions concerning the return of children in no way prejudge the merits of any custody issue (see article 19), they will in large measure influence children's lives; such decisions and such responsibilities necessarily belong ultimately to the authorities which ordinarily have jurisdiction according to internal law.

45   However, the application of the Convention, both in its broad outline and in the great majority of cases, will depend on the working of the instruments which were brought into being for this purpose, *i.e.* the Central Authorities. So far as their regulation by the Convention is concerned, the first point to be made is that the Conference was aware of the profound differences which existed as regards the internal organization of the Contracting States. That is why the Convention does not define the structure and capacity to act of the Central Authorities, both of which are necessarily governed by the internal law of each Contracting State. Acceptance of this premise is shown in the Convention by its recognition of the fact that the tasks specifically assigned to Central Authorities can be performed either by themselves, or with the assistance of intermediaries (article 7). For example, it is clear that discovering a child's whereabouts may require the intervention of the police; similarly, the adoption of provisional measures or the institution of legal proceedings concerning private relationships may fall outwith the scope of those powers which can be devolved upon administrative authorities in terms of some internal laws. Nonetheless, the Central Authority in every case remains the repository of those duties which the Convention imposes upon it, to the extent of its being the 'engine' for the desired co-operation which is designed to counter the wrongful removal of children. On the other hand, it is so as to take account of the peculiarities of different legal systems that the Convention allows a Central Authority to require that applications addressed to it be accompanied by a 'written authorization empowering it to act on behalf of the applicant, or to designate a representative so to act' (article 28).

46   In other respects, the Convention follows a long-established tradition of the Hague Conference,[20] by providing that States with more than one system of law or which have autonomous territorial organizations, as well as Federal States, are free to appoint more than one Central Authority. However, the problems encountered in the practical application of those Conventions which provide for several Central Authorities within the territory of a single State, as well as, in particular, the special characteristics of the subject-matter of this Convention, led the Conference to adopt the text previously established by the Special Commission and

---

[20] Par exemple, *cf.* l'article 18, troisième alinéa de la *Convention relative à la signification et la notification à l'étranger des actes judiciaires et extrajudiciaires en matière civile ou commerciale, du 15 novembre 1965. Id.* les articles 24 et 25 de la *Convention sur l'obtention des preuves à l'étranger en matière civile ou commerciale, du 18 mars 1970.*

[20] Compare, for example, article 18(3) of the *Convention of 15 November 1965 on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters.* Also, articles 24 and 25 of the *Convention of 18 March 1970 on the Taking of Evidence Abroad in Civil or Commercial Matters.*

en avant vers une sorte de «hiérarchisation» des Autorités centrales dans ces Etats. En effet, en nous limitant au deuxième aspect mentionné, si la personne qui a déplacé ou retenu un enfant se sert de l'extrême facilité des communications à l'intérieur d'un Etat, le demandeur ou l'Autorité centrale de l'Etat requérant pourraient être contraints de répéter plusieurs fois leur demande en vue d'obtenir le retour de l'enfant; de surcroît, il existe la possibilité que, même en ayant des raisons sérieuses de croire que l'enfant se trouve dans un Etat contractant, on ignore quelle est l'unité territoriale de sa résidence.

47   Pour fournir une solution à ces situations et à d'autres similaires, la Convention prévoit que les Etats qui établissent plus d'une Autorité centrale, désigneront simultanément «l'Autorité centrale à laquelle les demandes peuvent être adressées en vue de leur transmission à l'Autorité centrale compétente au sein de cet Etat» (article 6). La question est importante, du fait que la Convention limite, dans le temps, l'obligation imposée aux autorités judiciaires ou administratives de l'Etat requis, en ce qui concerne le retour immédiat de l'enfant;[21] une erreur dans le choix de l'Autorité centrale requise peut donc avoir des conséquences décisives pour les prétentions des parties. Or, pour éviter qu'un facteur non prévu par la Convention en modifie l'application normale, il faudra que cette sorte de «super Autorité centrale», envisagée à l'article 6, adopte une attitude active. En effet, puisqu'elle devra servir de pont entre l'Autorité centrale de son propre Etat qui est compétente dans chaque cas d'espèce d'une part, et les Autorités centrales des autres Etats contractants d'autre part, elle se verra contrainte de choisir entre procéder à la localisation de l'enfant pour pouvoir transmettre l'affaire à l'Autorité centrale adéquate, ou transmettre une copie de la demande à toutes les Autorités centrales de l'Etat, qui provoquera inévitablement une multiplication des services bureaucratiques. Mais il est hors de doute qu'une telle Autorité centrale jouera un rôle fondamental dans l'application de la Convention quant aux rapports qui affectent les Etats susmentionnés.

**B   La formule modèle**

48   Suivant en cela la décision prise par la Commission spéciale lors de sa seconde réunion, la Quatorzième session de la Conférence a adopté, en même temps que la Convention, une Recommandation qui incorpore une formule modèle pour les demandes en vue du retour des enfants déplacés ou retenus illicitement. A son sujet, il convient de faire deux remarques. La première concerne la valeur juridique de la Recommandation en question: pour l'établir, il semble souhaitable de recourir au droit général des organisations internationales. Or, dans cette optique, une recommandation est en substance une invitation non contraignante adressée par une organisation internationale à un, plusieurs ou tous les Etats membres. Par conséquent, les Etats ne sont pas tenus *stricto sensu* d'utiliser la formule modèle contenue dans cette Recommandation; on a même soigneusement évité de la présenter comme une annexe à la Convention.

Les motifs en sont évidents. Avant tout, étant donné l'absence d'expérience internationale préalable dans le domaine couvert par la Convention, on peut penser qu'après quelques années l'application pratique des dispositions

take a step towards creating a sort of 'hierarchy' of Central Authorities in those States. In fact, by confining our discussion to the latter point, we can see that if the person responsible for the removal or retention of a child avails himself of the excellent means of communication within a particular State, the applicant or Central Authority of the requesting State could be forced to re-apply several times in order to obtain the return of the child. Moreover, it is still possible that, even if there are valid reasons for believing that the child is in a Contracting State, the territorial unit of the child's residence will be ignored.

47   The Convention supplies a solution to these and other situations by providing that States which establish more than one Central Authority should at the same time designate 'the Central Authority to which applications may be addressed for transmission to the appropriate Central Authority within that State' (article 6). The matter is important, because the Convention imposes a time-limit upon the duty of judicial or administrative authorities in the requested State for the prompt return of the child;[21] a mistaken choice as to the requested Central Authority could therefore have decisive consequences for the claims of the parties. Now, so as to prevent a factor which was not provided for in the Convention modifying the Convention's normal application, this type of 'super-Central Authority' envisaged in article 6 will have to adopt a positive approach. As a matter of fact, if it is to act as a bridge between on the one hand the Central Authority of its own State which has jurisdiction in each particular case, and on the other hand the Central Authorities of the other Contracting States, it will find itself obliged to choose between proceeding to locate a child in order to transmit the matter to the appropriate Central Authority, and transmitting a copy of the application to all the Central Authorities of the State concerned, which would inevitably cause a great increase in administrative duties. However it is undoubtedly the case that such a Central Authority will play a fundamental role in the application of the Convention in regard to relations affecting the aforementioned States.

**B   The model form**

48   Following the decision taken by the Special Commission at its second meeting, the Fourteenth Session of the Conference adopted simultaneously with its adoption of the Convention, a Recommendation containing a model form for applications for the return of children wrongfully removed or retained. Two comments are appropriate here. The first concerns the legal force of this Recommendation. In drawing it up, it seemed advisable to have recourse to the general law governing international organizations. Now, viewed from this perspective, a recommendation is in substance a non-obligatory invitation addressed by one international organization to one, several or all Member States. Consequently, States are not strictly required to make use of the model form contained in the Recommendation; indeed, the Commission took care to avoid presenting the form as an annex to the Convention.

The reasons for this are clear. Most importantly, given the lack of prior international experience in this field, it can well be imagined that, after a number of years, the practical application of the Convention's provisions will result in

---

[21] *Cf. infra*, commentaire de l'article 12 de la Convention.

[21] *Cf. infra*, the commentary on article 12 of the Convention.

---

*Rapport Pérez-Vera*

*Pérez-Vera Report*          **439**

conventionnelles amène à conseiller l'introduction de certaines modifications dans la formule adoptée. Or, il semble préférable de ne pas soumettre une éventuelle révision du texte aux formalités qu'exigerait le droit international public en matière de révision des traités internationaux. On peut d'ailleurs soutenir qu'en marge d'une future action concertée de la Conférence sur ce point, l'adaptation de la formule recommandée aux Etats pourra aussi être l'œuvre des contacts bilatéraux entrepris par les Autorités centrales, en exécution de l'obligation générale visée à l'article 7, alinéa 2, lettre *i*.

D'autre part, une conséquence directe de la décision de ne pas rendre obligatoire l'emploi de la formule modèle est que la Convention contient une énumération des données que doit nécessairement inclure toute demande adressée à une Autorité centrale (article 8).

49   La deuxième remarque porte sur le domaine d'application et sur la teneur de la formule recommandée. En effet, bien que la Convention règle aussi des aspects importants concernant le droit de visite, la formule proposée se limite à offrir une requête modèle en vue du retour de l'enfant. Ceci montre la polarisation de l'intérêt de la Conférence sur la solution des problèmes posés après le déplacement de l'enfant, tout en mettant en relief l'originalité de la voie choisie pour y parvenir. C'est justement parce que cette voie est nouvelle qu'on a cru souhaitable d'insérer une indication concernant son mode d'utilisation.

50   Quant à la teneur de la formule, elle développe très justement les éléments exigés par la Convention; pourtant, nous voudrions attirer l'attention sur deux points mineurs. D'abord, sur la mention «date et lieu du mariage» des parents de l'enfant concerné: dans la mesure où elle n'est pas suivie, entre parenthèses, de l'expression «s'il y a lieu», il semble qu'on donne un traitement exceptionnel et discriminatoire à la situation des enfants naturels. D'ailleurs, l'absence de cette même expression à côté de la référence à la date et au lieu de naissance de l'enfant s'accorde mal avec la précision dont fait preuve sur ce point l'article 8 de la Convention, quand il ajoute en se référant à la date de naissance, «s'il est possible de se la procurer».

51   D'autre part, on constate un manque de concordance entre le texte français et le texte anglais, du point de vue des «renseignements concernant la personne dont il est allégué qu'elle a enlevé ou retenu l'enfant». A cet égard, il semble préférable de suivre le texte anglais, plus complet, surtout en ce qui concerne la mention de la nationalité du prétendu enleveur, un élément qui sera parfois décisif dans la localisation de l'enfant.


IV   STRUCTURE ET TERMINOLOGIE

A   *La structure de la Convention*

52   Les articles 1, 2, 3 et 5 définissent le domaine d'application matériel de la Convention, en précisant ses objectifs et les conditions requises pour pouvoir considérer que le déplacement ou le non-retour d'un enfant sont illicites. L'article 4 s'attache au domaine d'application personnel de la Convention, tandis que l'article 35 détermine son application dans le temps. Les articles 6 et 7 sont consacrés à la création des Autorités centrales et à leurs obligations. Les articles 8, 27 et 28 se réfèrent à la saisine des Autorités centrales et aux documents qui peuvent accompagner ou compléter une demande qui leur aurait été présentée. Les articles 9 à 12 et 14 à 19 traitent des différentes voies instaurées pour obtenir le retour d'un enfant, ainsi que de la portée juridique d'une décision à cet effet. Les articles 13 et 20 s'occupent des exceptions à l'obligation générale de renvoyer l'enfant. L'article 21 établit les devoirs spécifiques

certain modifications to the present form being thought advisable. Now, it seems better not to subject future revisions of the text to the formalities required by public international law for the revision of international treaties. Besides, it could be said, in connection with any future concerted action by the Conference in this regard, that adaptation of the form which was recommended to States should also be a matter for bilateral negotiations between Central Authorities, in implementation of their general obligation contained in article 7(2)(*i*).

On the other hand, a direct consequence of the decision not to make the use of the model form obligatory is the catalogue of details which every application to a Central Authority must contain (article 8).

49   The second comment bears upon the sphere of application and the terms of the recommended form. Although the Convention also governs important matters concerning access rights, the model form proposed is merely a model application for the return of the child. This demonstrates the concentration of interest within the Conference on the resolution of problems arising out of the removal of a child, whilst at the same time throwing into relief the novelty of the means chosen to resolve them. It is precisely because the means are new that it was thought advisable to include some indication of the way in which they should be used.

50   The actual terms of the form narrate precisely those points required by the Convention itself. We should however like to draw attention to two minor points. Firstly, the phrase 'date and place of marriage' of the parents of the child in question: in as much as it is not followed, in parentheses, by the words 'if any', it would seem to treat natural children in an exceptional and discriminatory fashion. Moreover, the absence of the same phrase alongside the reference to the date and place of birth of the child compares badly with the precision shown by article 8 of the Convention which adds, referring to the date of birth, the words 'where available'.

51   Secondly, there is an inconsistency between the French and English texts regarding the 'information concerning the person alleged to have removed or retained the child'. It would be advisable to follow the English text here, since it is more comprehensive, especially as regards its reference to the nationality of the alleged abductor, a fact which will sometimes prove decisive in efforts to locate the child.


IV   STRUCTURE AND TERMINOLOGY

A   *The structure of the Convention*

52   Articles 1, 2, 3 and 5 define the Convention's scope with regard to its subject-matter, by specifying its aims and the criteria by which the removal or retention of a child can be regarded as wrongful. Article 4 concerns the persons to whom the Convention applies, while article 35 determines its temporal application. Articles 6 and 7 are devoted to the creation of the Central Authorities and their duties. Articles 8, 27 and 28 are concerned with applications to Central Authorities and the documents which may accompany or supplement an application to them. Articles 9 to 12, and 14 to 19, deal with the various means established for bringing about the return of a child, as well as the legal significance of a decree to that effect. Articles 13 and 20 concern the exceptions to the general rule for the return of the child. Article 21 lays down the specific duties which the States have taken upon themselves with regard to access rights.

assumés par les Etats à l'égard du droit de visite. Les articles 22 à 26 et 30 (ainsi que les articles 27 et 28 susmentionnés) s'occupent de certains aspects techniques concernant la procédure et les frais qui peuvent découler des demandes introduites par l'application de la Convention. Les articles 29 et 36 reflètent le point de vue non exclusif qui a présidé à l'élaboration de la Convention en précisant, d'une part l'action directe possible des particuliers devant les autorités judiciaires ou administratives des Etats contractants, hors du cadre des dispositions conventionnelles, et d'autre part la faculté reconnue aux Etats contractants de déroger conventionnellement aux restrictions auxquelles le retour de l'enfant peut être soumis d'après la présente Convention. Les articles 31 à 34 ont trait aux Etats plurilégislatifs et aux rapports avec d'autres conventions. Finalement, les articles 37 à 45 contiennent les clauses finales.

### B   Terminologie utilisée par la Convention

53   Selon une tradition bien établie de la Conférence de La Haye, la Convention a évité de définir les termes utilisés, sauf ceux contenus à l'article 5 sur les notions de droit de garde et de droit de visite, indispensables pour établir le domaine d'application matériel de la Convention. Ceci sera examiné dans son contexte. Nous voulons simplement considérer ici un aspect qui concerne la terminologie et qui mérite, à notre avis, un bref commentaire. Il s'agit du manque de concordance entre le titre de la Convention et la terminologie utilisée dans son texte. En effet, tandis que le premier emploie l'expression «enlèvement international d'enfants», les dispositions conventionnelles ont recours à des périphrases ou, en tous cas, à des tournures moins évocatrices, telles que «déplacement» ou «non-retour». L'explication est directement en rapport avec la délimitation du domaine de la Convention. Sur ce point, comme nous l'avons souligné ci-dessus (voir Nos 12 à 16), une étude du sujet dont s'occupe la Convention met en relief qu'en ce qui concerne aussi bien les rapports normalement existants entre «enleveur» et «enfant» que les intentions du premier, nous sommes fort loin des délits visés sous les dénominations d'«enlèvement», «kidnapping» ou «secuestro». Comme on est fort éloignés des problèmes propres au droit pénal, on a donc évité d'utiliser dans le texte de la Convention des appellations pouvant avoir une signification équivoque. Par contre, on a cru souhaitable de retenir le terme d'«enlèvement» dans le titre de la Convention, étant donné son emploi habituel par les «mass-media» et son retentissement dans l'opinion publique. Néanmoins, pour éviter toute équivoque, ce même titre précise, comme le faisait déjà le titre de l'avant-projet, que la Convention n'a pour objet que de régler les «aspects civils» du phénomène visé. Si tout au long de ce Rapport nous employons de temps en temps des expressions telles qu'«enlèvement» ou «enleveur», comme on les trouve d'ailleurs dans la formule modèle, c'est parce qu'elles permettent parfois une rédaction plus aisée; mais il faudra en tout état de cause les entendre avec les nuances que comporte leur application au problème spécifique dont la Convention s'occupe.

### Deuxième partie — Commentaire des articles de la Convention

CHAPITRE PREMIER — CHAMP D'APPLICATION DE LA CONVENTION

54   Le chapitre premier définit le domaine d'application de la Convention quant à la matière et aux personnes concernées (domaine d'application *ratione materiae* et *ratione*

Articles 22 to 26 and 30 (like the aforementioned articles 27 and 28) deal with certain technical matters regarding proceedings and the costs which can result from applications submitted pursuant to the provisions of the Convention. Articles 29 and 36 reflect the 'non-exclusive' view which prevailed during the preparation of the Convention in stating, on the one hand, that applications may be submitted directly by individuals to the judicial or administrative authorities of the Contracting States, outwith the framework of the provisions of the Convention, and on the other hand that Contracting States have the acknowledged right to derogate by agreement from the restrictions which the present Convention allows to be imposed upon the return of the child. Articles 31 to 34 refer to States with more than one system of law and to the Convention's relations with other conventions. Lastly, articles 37 to 45 contain the Final Clauses.

### B   Terminology used in the Convention

53   Following a long-established tradition of the Hague Conference, the Convention avoided defining its terms, with the exception of those in article 5 concerning custody and access rights, where it was absolutely necessary to establish the scope of the Convention's subject-matter. These will be examined in their context. At this point we wish merely to consider one aspect of the terminology used which in our opinion merits a brief comment. It has to do with lack of correspondence between the title of the Convention and the terms used in the text. Whilst the former uses the phrase 'international child abduction', the provisions of the Convention avail themselves of circumlocutions or at any event of less evocative turns of phrase, such as 'removal' or 'retention'. The reason for this is quite in keeping with the Convention's limited scope. As was stressed above (see Nos 12 to 16), studies of the topic with which the Convention deals show clearly that, with regard both to the relationship which normally exists between 'abductor' and 'child' and to the intentions of the former, we are far removed from the offences associated with the terms 'kidnapping', '*enlèvement*' or '*secuestro*'. Since one is far removed from problems peculiar to the criminal law, the use in the text of the Convention of possibly ambiguous terms was avoided.

On the other hand, it was felt desirable to keep the term 'abduction' in the title of the Convention, owing to its habitual use by the 'mass media' and its resonance in the public mind. Nonetheless, so as to avoid any ambiguity, the same title, as in the Preliminary Draft, states clearly that the Convention only aims to regulate the 'civil aspects' of this particular phenomenon. If, in the course of this Report, expressions such as 'abduction' or 'abductor' are used from time to time, and one will find them also in the model form, that is because they sometimes permit of easier drafting; but at all events, they will have to be understood to contain nuances which their application to the specific problem with which the Convention deals may call for.

### Second Part — Commentary on the specific articles of the Convention

CHAPTER ONE — SCOPE OF THE CONVENTION

54   The first chapter defines the scope of the Convention as regards its subject-matter and the persons concerned (its scope *ratione materiae* and *ratione personae*). However, so as

---

*Rapport Pérez-Vera*

*personae*). Cependant, pour avoir une perspective globale du domaine conventionnel, il faut considérer aussi l'article 34 sur les relations avec d'autres conventions, l'article 35 concernant son domaine d'application dans le temps et les articles 31 à 33 qui ont trait à l'application de la Convention dans les Etats plurilégislatifs.

### Article premier — Les objectifs de la Convention

#### a   Observations générales

55   Cet article expose en deux paragraphes les objectifs conventionnels que nous avons traités assez largement dans la première partie de ce Rapport. Il est donc évident que l'absence de parallélisme entre le titre et le contenu de la Convention va plus loin que la question purement terminologique.[22] De toute façon, il faut reconnaître que les termes employés dans le titre, malgré leur manque de rigueur juridique, ont un pouvoir évocateur et une force qui attirent l'attention, ce qui est l'essentiel.

56   En ce qui concerne la nature des espèces réglées, une remarque de portée générale s'impose. Quoique la Convention n'inclue aucune disposition proclamant le caractère international des situations envisagées, une telle conclusion découle aussi bien du titre que des divers articles. Or, dans le cas présent, le caractère international provient d'une situation de fait, à savoir de la dispersion des membres d'une famille entre différents pays. Une situation purement interne lors de sa naissance peut donc tomber dans le domaine d'application de la Convention par le fait, par exemple, qu'un des membres de la famille se soit déplacé à l'étranger avec l'enfant, ou du désir d'exercer un droit de visite dans un autre pays où réside la personne qui prétend avoir ce droit. Par contre, la différence de nationalité des personnes concernées n'implique pas nécessairement que nous soyons devant un cas d'espèce international auquel la Convention doive s'appliquer, bien qu'il s'agisse d'un indice clair d'une internationalisation possible, au sens où nous l'avons décrit.

#### b   Lettre a

57   L'objectif d'assurer le retour immédiat des enfants déplacés ou retenus illicitement a été déjà longuement présenté. D'ailleurs, la Quatorzième session n'a changé en rien la teneur littérale de la formule élaborée par la Commission spéciale. Nous ne ferons donc ici que deux brèves considérations d'éclaircissement relatives à son libellé. La première concerne la caractérisation des comportements que l'on voudrait éviter par la réalisation de cet objectif. En résumé comme nous le savons déjà, il s'agit de toute conduite qui altère les rapports familiaux existant avant ou après toute décision judiciaire, en utilisant un enfant, transformé par ce fait en instrument et principale victime de la situation. Dans ce contexte, la référence aux enfants «retenus illicitement» entend couvrir les cas où l'enfant qui se trouvait dans un lieu autre que celui de sa résidence habituelle — avec le consentement de la personne qui exerçait normalement sa garde — n'est pas renvoyé par la personne avec laquelle il séjournait. C'est la situation type qui se produit quand le déplacement de l'enfant est la conséquence d'un exercice abusif du droit de visite.

---

[22] Voir sur ce point Rapport de la Commission spéciale, No 52.

to have an overall picture of the Convention's scope, one must consider also article 34 which deals with the Convention's relationship with other conventions, article 35 which concerns the Convention's temporal application, and articles 31 to 33 which relate to the application of the Convention in States with more than one legal system.

### Article 1 — The aims of the Convention

#### a   General observations

55   This article sets out in two paragraphs the objects of the Convention which were discussed in broad terms in the first part of this Report. It is therefore clear that the lack of correspondence between the title and the specific provisions of the Convention is more than merely a matter of terminology.[22] In any event, it must be realized that the terms used in the title, while lacking legal exactitude, possess an evocative power and force which attract attention, and this is essential.

56   As for the nature of the matters regulated by the Convention, one general comment is required. Although the Convention does not contain any provision which expressly states the international nature of the situations envisaged, such a conclusion derives as much from its title as from its various articles. Now, in the present case, the international nature of the Convention arises out of a factual situation, that is to say the dispersal of members of a family among different countries. A situation which was purely internal to start with can therefore come within the scope of the Convention through, for example, one of the members of the family going abroad with the child, or through a desire to exercise access rights in a country other than that in which the person who claims those rights lives. On the other hand, the fact that the persons concerned hold different nationality does not necessarily mean that the international type of case to which the Convention applies automatically will arise, although it would clearly indicate the possibility of its becoming 'international' in the sense described.

#### b   Sub-paragraph a

57   The aim of ensuring the prompt return of children wrongfully removed or retained has already been dealt with at length. Besides, the Fourteenth Session in no way altered the literal meaning of the wording devised by the Special Commission. Thus only two brief points by way of explanation will be put forward here. The first concerns the characterization of the behaviour which the realization of this objective seeks to prevent. To sum up, as we know, the conduct concerned is that which changes the family relationships which existed before or after any judicial decision, by using a child and thus turning it into an instrument and principal victim of the situation. In this context, the reference to children 'wrongfully retained' is meant to cover those cases where the child, with the consent of the person who normally has custody, is in a place other than its place of habitual residence and is not returned by the person with whom it was staying. This is the typical situation which comes about when the removal of the child results from the wrongful exercise of access rights.

---

[22] See the Report of the Special Commission, No 52.

58   En second lieu, le texte commenté précise que les enfants dont on essaie d'assurer le retour sont ceux qui ont été déplacés ou retenus «dans tout Etat contractant». Une telle précision a une double signification. D'une part, en ce qui concerne la disposition contenue à l'article 4, elle délimite le domaine d'application *ratione personae* de la Convention aux enfants qui, ayant leur résidence habituelle dans un des Etats contractants, sont déplacés ou retenus sur le territoire d'un autre Etat contractant.

59   Mais ces quelques mots ont aussi une signification toute différente. En effet, par ce biais, l'objectif de la Convention examinée, considéré en soi ou par rapport à la disposition de l'article 2, devient général, c'est-à-dire applicable à tous les enfants qui, dans les conditions décrites, se trouvent dans un Etat contractant. Pourtant, il y aura toujours une différence dans la situation juridique entre les enfants qui avaient leur résidence habituelle, avant le déplacement, dans un autre Etat contractant et les autres enfants. Ainsi, la situation des premiers devra être résolue par application directe des dispositions conventionnelles. Par contre, l'obligation des Etats envers les autres sera plus nuancée, dans la mesure où elle découlerait (abstraction faite de la législation interne) du devoir consacré par l'article 2, qui pourrait être décrit comme celui de prendre les mesures appropriées pour éviter que leurs territoires ne se convertissent en lieux de refuge d'éventuels «enleveurs».

*c   Lettre* b

60   L'objectif conventionnel visé à ce sous-alinéa a été clarifié dans la rédaction qu'il a reçue lors de la Quatorzième session.[23] En ce qui concerne son domaine, il est maintenant manifeste que les situations considérées sont les mêmes que celles auxquelles s'applique la Convention, c'est-à-dire les situations internationales qui mettent en relation deux ou plusieurs Etats contractants. La précision n'est pas superflue, surtout si l'on tient compte du fait que le texte de l'avant-projet permettait d'autres interprétations, notamment la référence à des situations internes.

61   Quant à savoir quelle est la portée qu'on a voulu donner à l'objectif qui y est consacré, il s'impose de faire une distinction entre droit de garde et droit de visite. En ce qui concerne le droit de garde, on peut dire que la Convention n'a pas essayé de le développer de manière autonome. C'est donc dans l'obligation générale exprimée dans l'article 2, ainsi que dans la régulation du retour de l'enfant — basée, comme nous le verrons dans le cadre du commentaire à l'article 3, sur le respect d'un droit de garde effectivement exercé et attribué par le droit de l'Etat de la résidence habituelle — qu'on doit trouver la suite de la disposition qui nous occupe à cet égard. Par contre, le droit de visite a eu un sort plus favorable et les bases sur lesquelles doit se construire son respect effectif apparaissent fixées, au moins dans leurs grandes lignes, dans le contexte de l'article 21.

*Article 2 — Obligation générale des Etats contractants*

62   En étroite relation avec les objectifs vastes et souples de l'article 1b, cet article consacre une obligation générale de comportement des Etats contractants; il s'agit donc d'une obligation qui, à l'encontre des obligations de résultat, normalement incluses dans une convention, n'exige pas de

[23] *Cf.* Doc. trav. No 2 (*Proposal of the United Kingdom delegation*) et P.-v. No 2.

58   Secondly, the text clearly that the children whose return it is sought to secure are those who have been removed to, or retained in, 'any Contracting State'. This wording is doubly significant. On the one hand, the provision in article 4 limits the scope of the Convention *ratione personae* to those children who, while being habitually resident in one of the Contracting States, are removed to or retained in, the territory of another Contracting State.

59   But these same words also have a quite different meaning. In fact, through this formulation this particular object of the Convention, whether considered in its own right or in relation to article 2, becomes indirectly a general one, applicable to all children who, in the circumstances set forth, are in any Contracting State. However, there will always be a difference between the legal position of those children who, prior to their removal, were habitually resident in another Contracting State, and that of other children. The position of the former will have to be resolved by the direct application of the provisions of the Convention. On the other hand, the duty of States towards the other children is less clear (leaving aside provisions of internal law) in so far as it derives from the obligation stated in article 2, which could be described as a duty to take appropriate measures to prevent their territory being turned into a place of refuge for potential 'abductors'.

*c   Sub-paragraph* b

60   The aim of the Convention contained in this sub-paragraph was clarified in the course of drafting at the Fourteenth Session.[23] So far as its scope is concerned, it is now clear that the situations under consideration are the same as those to which the Convention applies, that is to say international situations which involve two or more Contracting States. It should not be thought that precision in this matter is unnecessary, especially when one considers that the text of the Preliminary Draft allowed of other interpretations, and in particular a reference to internal situations.

61   As for knowing the desired meaning of the aim stated therein, it is necessary to draw a distinction between custody rights and access rights. With regard to custody rights, it can be said that the Convention has not attempted to deal with them separately. It is thus within the general obligation stated in article 2, and the regulation governing the return of the child — which is based, as we shall see in the commentary on article 3, upon respect for custody rights actually exercised and attributed under the law of the child's habitual residence — that one must look in order to find the consequences of the provision which concerns us here. On the other hand, access rights are treated more favourably, and the foundations upon which respect for their effective exercise seem fixed, at least in broad outline, within the context of article 21.

*Article 2 — General obligation of Contracting States*

62   Closely related to the objects stated in broad and flexible fashion in article 1b is the fact that this article sets forth a general duty incumbent upon Contracting States. It is thus a duty which, unlike obligations to achieve a result which are normally to be found in conventions, does not require

[23] *Cf.* Working Document No 2 (Proposal of the United Kingdom delegation) and *P.-v.* No 2.

réalisations concrètes, mais plus simplement l'adoption d'une attitude déterminée en vue d'aboutir à de telles réalisations. Dans le cas présent, l'attitude, le comportement demandé aux Etats se traduit par le fait de prendre «toutes les mesures appropriées pour assurer, dans les limites de leur territoire, la réalisation des objectifs de la Convention». La Convention essaie ainsi, tout en sauvegardant le caractère *self-executing* de ses autres articles, d'encourager les Etats contractants à s'inspirer de ces normes pour résoudre les situations similaires à celles dont elle s'occupe, mais ne rentrant pas dans son domaine d'application *ratione personae* ou *ratione temporis*. D'une part, cela doit conduire à une considération attentive des normes conventionnelles quand l'Etat envisagera une modification de sa législation interne en matière de droits de garde ou de visite; d'autre part, l'extension des objectifs de la Convention à des cas non couverts par ses dispositions devrait influencer l'action des tribunaux et se traduire par une diminution du jeu de l'exception d'ordre public au moment de se prononcer sur des relations internationales tombant hors du domaine d'application de la Convention.

63  De plus, dans sa dernière phrase, l'article précise une des mesures envisagées, en soulignant l'importance accordée par la Conférence à l'utilisation de procédures rapides dans les affaires concernant les droits de garde ou de visite. Pourtant, cette disposition n'impose pas aux Etats l'obligation d'adopter dans leur loi interne de nouvelles procédures; la concordance établie entre le texte français et le texte anglais cherche justement à éviter une telle interprétation, que le texte français original rendait possible. Elle se limite donc à demander aux Etats contractants d'utiliser, dans toute question concernant la matière objet de la Convention, les procédures les plus urgentes figurant dans leur propre droit.

*Article 3 — Le caractère illicite d'un déplacement ou d'un non-retour*

*a  Observations générales*

64  L'ensemble de l'article 3 constitue une disposition clé de la Convention, puisque de son application dépend le déclenchement des mécanismes conventionnels en vue du retour de l'enfant; en effet, la Convention n'impose l'obligation de retourner l'enfant que lorsqu'il y a eu un déplacement ou un non-retour considérés par elle comme illicites. Or, en précisant les conditions que doit réunir une situation pour que son altération unilatérale puisse être qualifiée d'illicite, cet article met indirectement en relief les rapports que la Convention entend protéger; ces rapports sont basés sur un double élément: *primo*, l'existence d'un droit de garde attribué par l'Etat de la résidence habituelle de l'enfant; *secundo*, l'exercice effectif de cette garde, avant le déplacement. Examinons de plus près la teneur des conditions mentionnées.

*b  L'élément juridique*

65  En ce qui concerne l'élément des situations visées qu'on pourrait appeler juridique, ce que la Convention se propose de défendre ce sont les relations qui se trouvent déjà protégées, au moins par l'apparence d'un titre valable sur le droit de garde, dans l'Etat de la résidence habituelle de l'enfant; c'est-à-dire par le droit de l'Etat où ces relations se déroulaient avant le déplacement. L'affirmation antérieure exige certaines précisions sur deux points. Le premier aspect que nous devons considérer a trait au droit dont la violation détermine l'existence d'un déplacement ou d'un non-retour illicites, au sens de la Convention. Il s'agit, comme nous venons de le dire, du droit de garde; en effet, bien qu'au

that actual results be achieved but merely the adoption of an attitude designed to lead to such results. In the present case, the attitude and behaviour required of States is expressed in the requirement to 'take all appropriate measures to secure within their territories the implementation of the objects of the Convention'. The Convention also seeks, while safeguarding the 'self-executing' character of its other articles, to encourage Contracting States to draw inspiration from these rules in resolving problems similar to those with which the Convention deals, but which do not fall within its scope *ratione personae* or *ratione temporis*. On the one hand, this should lead to careful examination of the Convention's rules whenever a State contemplates changing its own internal laws on rights of custody or access; on the other hand, extending the Convention's objects to cases which are not covered by its own provisions should influence courts and be shown in a decreasing use of the public policy exception when questions concerning international relations which are outwith the scope of the Convention fall to be decided.

63  Moreover, the last sentence of the article specified one of the particular means envisaged, while stressing also the importance placed by the Convention on the use of speedy procedures in matters of custody or access rights. However, this provision does not impose an obligation upon States to bring new procedures into their internal law, and the correspondence now existing between the French and English texts rightly seeks to avoid such an interpretation, which the original French text made possible. It is therefore limited to requesting Contracting States, in any question concerning the subject-matter of the Convention, to use the most expeditious procedures available in their own law.

*Article 3 — The unlawful nature of a removal or retention*

*a  General observations*

64  Article 3 as a whole constitutes one of the key provisions of the Convention, since the setting in motion of the Convention's machinery for the return of the child depends upon its application. In fact, the duty to return a child arises only if its removal or retention is considered wrongful in terms of the Convention. Now, in laying down the conditions which have to be met for any unilateral change in the *status quo* to be regarded as wrongful, this article indirectly brings into clear focus those relationships which the Convention seeks to protect. Those relationships are based upon the existence of two facts, firstly, the existence of rights of custody attributed by the State of the child's habitual residence and, secondly, the actual exercise of such custody prior to the child's removal. Let us examine more closely the import of these conditions.

*b  The juridical element*

65  As for what could be termed the juridical element present in these situations, the Convention is intended to defend those relationships which are already protected, at any rate by virtue of an apparent right to custody in the State of the child's habitual residence, *i.e.* by virtue of the law of the State where the child's relationships developed prior to its removal. The foregoing remark requires further explanation in two respects. The first point to be considered concerns the law, a breach of which determines whether a removal or retention is wrongful, in the Convention sense. As we have just said, this is a matter of custody rights. Although the problems which can arise from a breach of

cours de la Quatorzième session les problèmes pouvant dériver de la violation d'un droit de visite, surtout quand le titulaire de la garde déplace l'enfant à l'étranger, aient été soulevés, l'opinion majoritaire a été qu'on ne peut pas assimiler une telle situation aux déplacements illicites qu'on essaie de prévenir.[24]

Cet exemple, et d'autres similaires où la violation du droit de visite altère profondément l'équilibre de la situation établie par une décision, sont certes la preuve de ce que les décisions sur la garde des enfants devraient toujours être susceptibles de révision. Mais ce problème échappe à l'effort de coordination entrepris par la Conférence de La Haye; on aurait abouti à des résultats contestables si, à travers une égale protection accordée aux droits de garde et de visite, l'application de la Convention avait conduit, au fond, à la substitution des titulaires de l'un par ceux de l'autre.

66    La deuxième question à examiner se réfère au droit choisi pour évaluer la validité initiale du titre invoqué. Nous ne nous arrêterons pas ici sur le concept de la résidence habituelle; il s'agit en effet d'une notion familière à la Conférence de La Haye, où elle est comprise comme une notion de pur fait, qui diffère notamment de celle du domicile. D'ailleurs, le choix du droit de la résidence habituelle en tant que critère déterminant de la validité de la situation violée par l'enlèvement est logique. En fait, aux arguments qui ont agi en faveur de lui accorder un rôle prééminent en matière de protection des mineurs, comme dans la Convention de La Haye de 1961, vient s'ajouter la propre nature même de la Convention, c'est-à-dire sa portée limitée. En ce sens, il faut faire deux considérations: d'une part, la Convention n'essaie pas de régler définitivement la garde des enfants, ce qui affaiblit considérablement les arguments favorables à la loi nationale; d'autre part, les normes conventionnelles reposent, dans une large mesure, sur l'idée sous-jacente qu'il existe une sorte de compétence naturelle des tribunaux de la résidence habituelle de l'enfant dans un litige relatif à sa garde.

Dans une perspective différente, nous devons aussi attirer l'attention sur le fait que la Convention parle du «droit» de l'Etat de la résidence habituelle, s'écartant ainsi de la tradition bien établie par les Conventions de La Haye sur la loi applicable, élaborées à partir de 1955, qui soumettent la réglementation du sujet dont elles s'occupent à une loi interne déterminée. Certes, dans ces cas, le terme «loi» doit être compris dans son sens le plus large, celui qui recouvre aussi bien les règles écrites et coutumières – quel qu'en soit le rang – que les précisions apportées par leur interprétation jurisprudentielle. Cependant, l'adjectif «interne» implique l'exclusion de toute référence aux règles de conflit de la loi désignée. Donc, si la Convention a abandonné la formule traditionnelle pour parler du «droit de la résidence habituelle», la différence ne saurait être purement terminologique. En effet, comme le montrent les travaux préparatoires,[25] dès le début, l'intention a été d'élargir davantage l'éventail des dispositions qui doivent être prises en considération dans ce contexte. En fait, il y a même eu, au cours de la Quatorzième session, une proposition tendant à expliciter dans cet article que la référence au droit de la résidence habituelle s'étend à ces normes de droit international privé; si la proposition a été rejetée, c'est parce que la Conférence était convaincue qu'une telle inclusion était superflue et s'avérait implicite du moment que le texte

access rights, especially where the child is taken abroad by its custodian, were raised during the Fourteenth Session, the majority view was that such situations could not be put in the same category as the wrongful removals which it is sought to prevent.[24]

This example, and others like it where breach of access rights profoundly upsets the equilibrium established by a judicial or administrative decision, certainly demonstrate that decisions concerning the custody of children should always be open to review. This problem however defied all efforts of the Hague Conference to co-ordinate views thereon. A questionable result would have been attained had the application of the Convention, by granting the same degree of protection to custody and access rights, led ultimately to the substitution of the holders of one type of right by those who held the other.

66    The second question which should be examined concerns the law which is chosen to govern the initial validity of the claim. We shall not dwell at this point upon the notion of habitual residence, a well-established concept in the Hague Conference, which regards it as a question of pure fact, differing in that respect from domicile. Moreover, the choice of the law of habitual residence as the factor which is to determine the lawfulness of the situation flouted by the abduction is logical. In actual fact, to the arguments in favour of its being accorded a pre-eminent role in the protection of minors, as in the Hague Convention of 1961, must be added the very nature of the Convention itself, viz. its limited scope. In this regard, two points must be made: on the one hand, the Convention does not seek to govern definitively questions concerning the custody of children, a fact which weakens considerably those arguments favouring the application of national law; on the other hand, the rules of the Convention rest largely upon the underlying idea that there exists a type of jurisdiction which by its nature belongs to the courts of a child's habitual residence in cases involving its custody.

From a different viewpoint, our attention should also be drawn to the fact that the Convention speaks of the 'law' of the State of habitual residence, thus breaking with a long-established tradition of Hague Conventions on applicable law since 1955, which refer to a particular internal law to govern the matters with which they deal. Of course, in such cases, the word 'law' has to be understood in its widest sense, as embracing both written and customary rules of law – whatever their relative importance might be – and the interpretations placed upon them by case-law. However, the adjective 'internal' implies the exclusion of all reference to the conflict of law rules of the particular legal system. Therefore, since the Convention has abandoned its traditional formulation by speaking of 'the law of the habitual residence', this difference cannot be regarded as just a matter of terminology. In fact, as the preliminary proceedings of the Commission demonstrate,[25] it was intended right from the start to expand considerably the range of provisions which have to be considered in this context. Actually, a proposal was made during the Fourteenth Session that this article should make it clear that the reference to the law of the habitual residence extends also to the rules of private international law. The fact that this proposal was rejected was due to the Conference's view that its inclusion was unnecessary and became implicit anyway

---

[24]  Cf. Doc. trav. No 5 (Proposition de la délégation canadienne) et P.-v. No 3.

[25]  Cf. le Rapport de la Commission spéciale, No 62, supra, p. 90.

[24]  Cf. Working Document No 5 (Proposal of the Canadian delegation) and P.-v. No 3.

[25]  Cf. the Special Commission Report, No 62, supra, p. 90.

---

n'exclut ni directement ni indirectement les règles en question.[26]

67  Les considérations antérieures nous montrent que l'invocation du droit de la résidence habituelle de l'enfant est aussi large que possible. De même, les sources dont peut découler le droit de garde qu'on essaie de protéger sont toutes celles qui peuvent fonder une réclamation dans le cadre du système juridique en question. A cet égard, l'alinéa 2 de l'article 3 considère certaines -- les plus importantes sans doute -- de ces sources, mais en soulignant la nature non exhaustive de l'énumération; cet alinéa dispose en effet que «le droit de garde visé en *a* peut notamment résulter . . .», en soulignant de la sorte l'existence possible d'autres titres non considérés dans le texte. Or, comme nous le verrons dans les paragraphes suivants, les sources retenues couvrent un vaste éventail juridique; la précision de leur caractère partiel doit donc être surtout comprise comme favorisant une interprétation souple des concepts employés, qui permette d'appréhender le maximum d'hypothèses possibles.

68  La première des sources à laquelle l'article 3 fait allusion est la loi, quand il dit que la garde peut «résulter d'une attribution de plein droit». Cela nous amène à insister sur l'un des traits caractéristiques de cette Convention, nommément son applicabilité à la protection des droits de garde exercés avant toute décision en la matière. Le point est important, car on ne peut pas ignorer que, dans une perspective statistique, les cas où l'enfant est déplacé avant qu'une décision concernant sa garde n'ait été prononcée sont assez fréquents. D'ailleurs, dans de telles situations, les possibilités existantes, en marge de la Convention, pour le parent dépossédé de récupérer l'enfant sont presque nulles, sauf s'il recourt à son tour à des voies de fait toujours pernicieuses pour l'enfant. A cet égard, en introduisant ces cas dans son domaine d'application, la Convention a progressé de manière significative dans la solution des problèmes réels qui échappaient auparavant, dans une large mesure, aux mécanismes traditionnels du droit international privé.

Quant à savoir quel est, selon la Convention, le système juridique qui peut attribuer le droit de garde qu'on désire protéger, il nous faut en revenir aux considérations développées au paragraphe précédent. Ainsi donc, la garde *ex lege* pourra se baser soit sur la loi interne de l'Etat de la résidence habituelle de l'enfant, soit sur la loi désignée par les règles de conflit de cet Etat. Le jeu de la première option est parfaitement clair; en ce qui concerne la seconde, elle impliquerait, par exemple, que le déplacement par son père français d'un enfant naturel ayant sa résidence habituelle en Espagne où il habitait avec sa mère, tous les deux étant aussi de nationalité française, devrait être considéré comme illicite au sens de la Convention, par application de la loi française désignée comme compétente par la règle de conflit espagnole en matière de garde et indépendamment du fait que l'application de la loi interne espagnole aurait vraisemblablement conduit à une autre solution.

69  La deuxième source du droit de garde, retenue à l'article 3, est l'existence d'une décision judiciaire ou administrative. Etant donné que la Convention n'ajoute aucune précision sur ce point, il faut considérer, d'une part que le mot «décision» est utilisé dans son sens le plus large, de manière à embrasser toute décision ou élément de décision (judiciaire ou administrative) concernant la garde d'un

67  The foregoing considerations show that the law of the child's habitual residence is invoked in the widest possible sense. Likewise, the sources from which the custody rights which it is sought to protect derive, are all those upon which a claim can be based within the context of the legal system concerned. In this regard, paragraph 2 of article 3 takes into consideration some — no doubt the most important — of those sources, while emphasizing that the list is not exhaustive. This paragraph provides that 'the rights of custody mentioned in sub-paragraph *a* above may arise in particular', thus underlining the fact that other sorts of rights may exist which are not contained within the text itself. Now, as we shall see in the following paragraphs, these sources cover a vast juridical area, and the fact that they are not exhaustively set out must be understood as favouring a flexible interpretation of the terms used, which allows the greatest possible number of cases to be brought into consideration.

68  The first source referred to in article 3 is law, where it is stated that custody 'may arise . . . by operation of law'. That leads us to stress one of the characteristics of this Convention, namely its application to the protection of custody rights which were exercised prior to any decision thereon. This is important, since one cannot forget that, in terms of statistics, the number of cases in which a child is removed prior to a decision on its custody are quite frequent. Moreover, the possibility of the dispossessed parent being able to recover the child in such circumstances, except within the Convention's framework, is practically non-existent, unless he in his turn resorts to force, a course of action which is always harmful to the child. In this respect, by including such cases within its scope, the Convention has taken a significant step towards resolving the real problems which in the past largely escaped the control of the traditional mechanisms of private international law.

As for knowing the legal system which, according to the Convention, is to attribute the custody rights, which it is desired to protect, it is necessary to go back to the considerations developed in the previous paragraph. Thus, custody *ex lege* can be based either on the internal law of the State of the child's habitual residence, or on the law designated by the conflict rules of that State. The scope of the first option is quite clear; the second implies, for example, that the removal by its French father of a child born out of wedlock which had its habitual residence in Spain where it lived with its mother, both mother and child being of French nationality, should be considered wrongful in the Convention sense, by means of the application of French law designated as applicable by the Spanish conflict rule on questions of custody, quite independently of the fact that application of internal Spanish law would probably have led to a different result.

69  The second source of custody rights contained in article 3 is a judicial or administrative decision. Since the Convention does not expand upon this, it must be deemed, on the one hand, that the word 'decision' is used in its widest sense, and embraces any decision or part of a decision (judicial or administrative) on a child's custody and, on the other hand, that these decisions may have been issued by the courts of

---

[26]  *Cf.* Doc. trav. No 2 (*Proposal of the United Kingdom delegation*) et P.-v. No 2.

[26]  *Cf.* Working Document No 2 (Proposal of the United Kingdom delegation), and *P.-v.* No 2.

enfant; d'autre part que les décisions visées peuvent avoir été rendues aussi bien par les tribunaux de l'Etat de la résidence habituelle de l'enfant que par ceux d'un Etat tiers.[27] Or, dans cette dernière hypothèse, c'est-à-dire lorsque le droit de garde s'exerçait dans l'Etat de la résidence habituelle de l'enfant sur la base d'une décision étrangère, la Convention n'exige pas qu'elle ait été formellement reconnue. En conséquence, il doit suffire aux effets considérés que la décision soit telle au regard du droit de l'Etat de la résidence habituelle, c'est-à-dire, en principe, qu'elle présente les caractéristiques *minima* pour pouvoir déclencher une procédure en vue de son homologation ou de sa reconnaissance;[28] interprétation large qui se trouve d'ailleurs confirmée par la teneur de l'article 14 de la Convention.

70   Finalement, le droit de garde peut découler, d'après l'article 3, «d'un accord en vigueur selon le droit de cet Etat». En principe, les accords envisagés peuvent être de simples transactions privées entre les parties, au sujet de la garde des enfants. La condition d'être «en vigueur» selon le droit de l'Etat de la résidence habituelle, a été introduite au cours de la Quatorzième session en substitution de l'exigence d'avoir «force de loi», qui figurait dans l'avant-projet. La modification répond à un désir de clarification, mais aussi d'assouplissement, autant que possible, des conditions posées à l'acceptation d'un accord en tant que source de la garde protégée par la Convention. Sur le point précis de savoir ce qu'est un accord «en vigueur» selon un droit déterminé, il nous semble que l'on doive inclure sous cette appellation tout accord qui ne soit pas interdit par un tel droit et qui puisse servir de base à une prétention juridique devant les autorités compétentes. Or, pour en revenir au sens large que la notion «droit de l'Etat de la résidence habituelle de l'enfant» a reçu dans cet article 3, le droit en question peut être aussi bien la loi interne de cet Etat que la loi désignée par ses règles de conflit; le choix entre les deux branches de l'option appartient aux autorités de l'Etat concerné, quoique l'esprit de la Convention semble incliner pour celle qui, dans chaque cas d'espèce, légitime la garde effectivement exercée. D'autre part, la Convention ne précise point les conditions de fond ou de forme que ces accords doivent remplir; elles changeront donc selon la teneur du droit impliqué.

71   Tout en ajournant l'étude de la personne qui peut être titulaire d'un droit de garde au commentaire de l'article 4 sur le domaine d'application *ratione personae* de la Convention, il convient d'insister ici sur le fait qu'on s'est proposé de protéger toutes les modalités d'exercice de la garde d'enfants. En effet, aux termes de l'article 3, le droit de garde peut avoir été attribué, seul ou conjointement, à la personne qui demande qu'on en respecte l'exercice. Il ne pouvait en être autrement à une époque où les législations internes introduisent progressivement la modalité de la garde conjointe, considérée comme la mieux adaptée au principe général de la non-discrimination à raison du sexe. D'ailleurs, la garde conjointe n'est pas toujours une garde *ex lege*, dans la mesure où les tribunaux se montrent de plus en plus favorables, si les circonstances le permettent, à partager entre les deux parents les responsabilités inhérentes au droit de garde. Or, dans l'optique adoptée par la Convention, le déplacement d'un enfant par l'un des titulaires de la garde

the State of the child's habitual residence as well as by the courts of a third country.[27] Now, in the latter case, that is to say when custody rights were exercised in the State of the child's habitual residence on the basis of a foreign decree, the Convention does not require that the decree had been formally recognized. Consequently, in order to have the effect described, it is sufficient that the decision be regarded as such by the State of habitual residence, *i.e.* that it contain in principle certain minimum characteristics which are necessary for setting in motion the means by which it may be confirmed or recognized.[28] This wide interpretation is moreover confirmed by the whole tenor of article 14.

70   Lastly, custody rights may arise according to article 3, 'by reason of an agreement having legal effect under the law of that State'. In principle, the agreements in question may be simple private transactions between the parties concerning the custody of their children. The condition that they have 'legal effect' according to the law of the State of habitual residence was inserted during the Fourteenth Session in place of a requirement that it have the 'force of law', as stated in the Preliminary Draft. The change was made in response to a desire that the conditions imposed upon the acceptance of agreements governing matters of custody which the Convention seeks to protect should be made as clear and as flexible as possible. As regards the definition of an agreement which has 'legal effect' in terms of a particular law, it seems that there must be included within it any sort of agreement which is not prohibited by such a law and which may provide a basis for presenting a legal claim to the competent authorities. Now, to go back to the wide interpretation given by article 3 to the notion of 'the law of the State of the child's habitual residence', the law concerned can equally as well be the internal law of that State as the law which is indicated as applicable by its conflict rules. It is for the authorities of the State concerned to choose between the two alternatives, although the spirit of the Convention appears to point to the choice of the one which, in each particular case, would recognize that custody had actually been exercised. On the other hand, the Convention does not state, in substance or form, the conditions which these agreements must fulfil, since these will change according to the terms of the law concerned.

71   Leaving aside a consideration of those persons who can hold rights of custody, until the commentary on article 4 which concerns the scope of the Convention *ratione personae*, it should be stressed now that the intention is to protect *all* the ways in which custody of children can be exercised. Actually, in terms of article 3, custody rights may have been awarded to the person who demands that their exercise be respected, and to that person in his own right or jointly. It cannot be otherwise in an era when types of joint custody, regarded as best suited to the general principle of sexual non-discrimination, are gradually being introduced into internal law. Joint custody is, moreover, not always custody *ex lege*, in as much as courts are increasingly showing themselves to be in favour, where circumstances permit, of dividing the responsibilities inherent in custody rights between both parents. Now, from the Convention's standpoint, the removal of a child by one of the joint holders without the consent of the other, is equally wrongful, and

---

[27] Cette interprétation s'appuie sur les travaux qui ont conduit à l'adoption d'un texte, similaire à l'actuel, au sein de la Commission spéciale. Voir Rapport de la Commission spéciale, No 64, *supra*, p. 191-192.
[28] Sur l'intérêt de ce que la Convention inclue un tel cas, voir le Doc. trav. No 58. «Document de clarification présenté par la délégation italienne».

[27] This interpretation is based upon the deliberations of the Special Commission which led to its adopting a similar text to the current one. See Report of the Special Commission, No 64, *supra*, pp. 191-192.
[28] See Working Document No 58, '*Document de clarification présenté par la délégation italienne*', for the desirability of including such a case in the Convention.

---

*Rapport Pérez-Vera*

*Pérez-Vera Report*                                                        447

conjointe, sans le consentement de l'autre titulaire, est également illicite; ce caractère illicite proviendrait, dans ce cas précis, non pas d'une action contraire à la loi, mais du fait qu'une telle action aurait ignoré les droits de l'autre parent, également protégé par la loi, et interrompu leur exercice normal. La véritable nature de la Convention apparaît plus clairement dans ces situations: elle ne cherche pas à établir à qui appartiendra dans l'avenir la garde de l'enfant, ni s'il s'avérera nécessaire de modifier une décision de garde conjointe rendue sur la base de données qui ont été altérées par la suite; elle essaie plus simplement d'éviter qu'une décision ultérieure à cet égard puisse être influencée par un changement des circonstances introduit unilatéralement par l'une des parties.

this wrongfulness derives in this particular case, not from some action in breach of a particular law, but from the fact that such action has disregarded the rights of the other parent which are also protected by law, and has interfered with their normal exercise. The Convention's true nature is revealed most clearly in these situations: it is not concerned with establishing the person to whom custody of the child will belong at some point in the future, nor with the situations in which it may prove necessary to modify a decision awarding joint custody on the basis of facts which have subsequently changed. It seeks, more simply, to prevent a later decision on the matter being influenced by a change of circumstances brought about through unilateral action by one of the parties.

#### c   L'élément de fait

72   Le deuxième élément qui caractérise les rapports protégés par la Convention est que le droit de garde, qu'on prétend violé par le déplacement, ait été exercé de façon effective par son titulaire. En effet, du moment qu'on a choisi une approche du sujet conventionnel s'écartant de la pure et simple reconnaissance internationale des droits de garde attribués aux parents, la Convention a mis l'accent sur la protection du droit des enfants au respect de leur équilibre vital; c'est-à-dire du droit des enfants à ne pas voir altérées les conditions affectives, sociales, etc., qui entourent leur vie, à moins qu'il n'existe des arguments juridiques garantissant la stabilité d'une nouvelle situation. Cette approche est reflétée dans la limite du domaine d'application de la Convention aux droits de garde effectivement exercés. De plus, une telle conception se trouve justifiée dans le cadre des relations internationales par un argument complémentaire, touchant au fait que, dans ce contexte, il est relativement fréquent qu'il existe des décisions contradictoires peu à même de servir de base à la protection de la stabilité de la vie d'un enfant.

73   En réalité, cette conception a été à peine contestée. Pourtant, plusieurs propositions[29] ont été présentées en vue de supprimer de l'article 3 toute référence à l'exercice effectif de la garde; la raison en était que, par ce biais, on imposait au demandeur le fardeau d'une preuve sur un point qui serait parfois difficile à établir. La situation semblait encore plus compliquée si on tenait compte du fait que l'article 13 consacré aux exceptions possibles à l'obligation de faire retourner l'enfant exige, de «l'enleveur» cette fois, la preuve que la personne dépossédée n'exerçait pas effectivement la garde qu'elle réclame maintenant. Or, c'est justement en rapprochant les deux dispositions que l'on fait apparaître nettement la véritable nature de la condition prévue à l'article 3. En effet, cette condition, en délimitant le domaine d'application de la Convention, n'exige du demandeur qu'une première évidence du fait qu'il exerçait réellement les soins sur la personne de l'enfant; cette circonstance doit être, en général, assez facile à établir. D'ailleurs, le caractère non formel de cette exigence est mis en relief à l'article 8 lorsque, parmi les données que doit contenir la demande introduite auprès des Autorités centrales, il indique simplement sous c «les motifs sur lesquels se base le demandeur pour réclamer le retour de l'enfant». Par contre, l'article 13 de la Convention (12 de l'avant-projet) nous place devant un véritable fardeau de la preuve à la charge de «l'enleveur»; c'est en effet lui qui doit établir,

#### c   The factual element

72   The second element characterizing those relationships protected by the Convention is that the custody rights which it is claimed have been breached by the child's removal were actually exercised by the holder. In fact, as soon as an approach to the subject-matter of the Convention was adopted which deviated from the pure and simple international recognition of custody rights attributed to parents, the Convention put its emphasis on protecting the right of children to have the stability which is so vital to them respected. In other words, the Convention protects the right of children not to have the emotional, social etc. aspects of their lives altered, unless legal arguments exist which would guarantee their stability in a new situation. This approach is reflected in the scope of the Convention, which is limited to custody rights actually exercised. What is more, such a notion is justified within the framework of international relations by a complementary argument which concerns the fact that contradictory decisions arise quite frequently in this particular context, decisions which are basically of little use in protecting the stability of a child's life.

73   Actually, this idea was not opposed to any extent. However, several proposals[29] were put forward for the deletion from article 3 of any reference to the actual exercise of custody rights. The reason for this was that its retention could place on the applicant the burden of proving a point which would sometimes be difficult to establish. The situation became even more complicated when account was taken of the fact that article 13, which concerns the possible exceptions to the obligation to order the return of the child, requires the 'abductor' this time to prove that the dispossessed party had not actually exercised the custody rights he now claims. Now, it is indeed by considering both provisions together that the true nature of the condition set forth in article 3 can be seen clearly. This condition, by defining the scope of the Convention, requires that the applicant provide only some preliminary evidence that he actually took physical care of the child, a fact which normally will be relatively easy to demonstrate. Besides, the informal nature of this requirement is highlighted in article 8 which simply includes, in sub-paragraph c, 'the grounds on which the applicant's claim for return of the child is based', amongst the facts which it requires to be contained in applications to the Central Authorities.
On the other hand, article 13 of the Convention (12 in the Preliminary Draft) shows us the real extent of the burden of proof placed upon the 'abductor'; it is for him to show, if he

---

[29]  Cf. Doc. trav. No 1 (Proposal of the United States delegation) et No 10 (Proposal of the Finnish delegation), ainsi que le P.-v. No 3.

[29]  Cf. Working Documents Nos 1 (Proposal of the United States delegation) and 10 (Proposal of the Finnish delegation), and also P.-v. No 3.

---

pour éviter le retour de l'enfant, que le gardien n'exerçait pas effectivement le droit de garde. Donc, nous pouvons en arriver à la conclusion que l'ensemble de la Convention est construit sur la présomption non explicite que celui qui a le soin de la personne de l'enfant en exerce effectivement la garde; cette idée devra être détruite en vertu de l'inversion du fardeau de la preuve qui est le propre de toute présomption, (par «l'enleveur» s'il veut éviter que l'enfant ne soit renvoyé).

74   Cependant, la Convention inclut expressément dans le domaine qu'elle entend protéger la situation qui se pose quand la garde n'a pas pu devenir effective à cause précisément du déplacement de l'enfant; c'est en ce sens que se prononce le dernier membre de phrase de la lettre b de l'article 3. En théorie, l'idée sous-jacente s'accorde parfaitement avec l'esprit qui inspire la Convention; c'est donc d'un point de vue pratique qu'on peut se demander si un tel ajout était nécessaire.[30] Dans cette optique, les hypothèses que cette précision essaie de protéger visent deux situations types possibles, dont l'une rentrerait clairement dans le domaine d'application de la Convention, tandis que l'autre, à défaut de cette norme, exigerait vraisemblablement une interprétation trop forcée de ses dispositions. Il s'agit, d'une part, des cas soulevés lorsqu'une première décision sur la garde est mise en échec par le déplacement de l'enfant; or, dans la mesure où une telle décision suit, dans un délai raisonnable, la rupture de la vie familiale commune, on peut considérer que le titulaire de la garde l'avait exercée au préalable et qu'en conséquence la situation décrite remplit toutes les conditions que fixe le domaine d'application conventionnel. Pourtant, si nous nous plaçons devant une décision sur la garde, rendue par les tribunaux de la résidence habituelle de l'enfant, qui modifie une décision précédente et dont l'exécution est rendue impossible par l'action du ravisseur, il peut se trouver que le nouveau titulaire de la garde ne l'ait pas exercée dans un délai étendu; les difficultés qu'on rencontrerait dans de telles situations, et peut-être dans d'autres non visées dans ces lignes, pour invoquer la Convention sont évidentes. En conclusion, et quoiqu'il faille s'attendre à ce que le jeu de cette disposition ne soit pas fréquent, nous devons conclure que son inclusion dans la Convention peut s'avérer utile.

*Article 4 — Domaine d'application* ratione personae

75   Cet article ne concerne que le domaine d'application *ratione personae* de la Convention par rapport aux enfants protégés. Pourtant dans un souci de systématisation, nous traiterons aussi dans son contexte les autres aspects du problème, c'est-à-dire les titulaires possibles des droits de garde et de visite et les personnes qui pourraient être considérées comme «enleveurs», aux termes de la Convention.

*a   Les enfants protégés*

76   La Convention s'applique aux enfants âgés de moins de seize ans qui avaient «leur résidence habituelle dans un Etat contractant immédiatement avant l'atteinte aux droits de garde ou de visite». En relation avec l'exigence concernant la résidence habituelle, il faut revenir aux considérations émises sur la nature de la Convention, qui aboutissent à la conclusion qu'une convention de coopération entre

wishes to prevent the return of the child, that the guardian had not actually exercised his rights of custody. Thus, we may conclude that the Convention, taken as a whole, is built upon the tacit presumption that the person who has care of the child actually exercises custody over it. This idea has to be overcome by discharging the burden of proof which has shifted, as is normal with any presumption (*i.e.* discharged by the 'abductor' if he wishes to prevent the return of the child).

74   However, there is expressly included amongst the matters which the Convention is intended to protect the situation which arises when actual custody cannot be exercised precisely because of the removal of the child; that is the situation envisaged in the last alternative set out in article 3b. Theoretically, the underlying idea is perfectly in keeping with the spirit of the Convention, and it is therefore from a practical point of view that it may be wondered whether such a provision needed to be added.[30] From this viewpoint, the hypothetical situations which this provision is designed to protect are of two types, one of which falls clearly within the scope of the Convention, while the other, failing this rule, would probably require too strained an interpretation of its provisions. On the one hand, there are cases where an initial decision on custody is rendered worthless by the removal of the child. In so far as such a description follows the disruption of normal family life after a reasonable lapse of time, the holder of the rights could be regarded as having exercised them from the outset, so that the situation described fulfils all the conditions laid down within the scope of the Convention. However, if a decision on custody by the courts of the child's habitual residence is considered, which modifies a prior decision and cannot be enforced because of the action of the abductor, it could be that the new holder of the right to custody has not exercised it within the extended time-limit. The difficulties which would be encountered in seeking to apply the Convention to such situations and perhaps to others not herein mentioned, are obvious. To conclude, although this provision must not be expected to come into play very often, it has to be said finally that its inclusion in the Convention might prove to be useful.

*Article 4 — Convention's scope* ratione personae

75   This article concerns only the Convention's scope *ratione personae* as regards the children who are to be protected. However, for the sake of completeness, we shall also deal with the other aspects of the problem in their proper context, that is to say those potential holders of custody and access rights and those who could be regarded as 'abductors', within the terms of the Convention.

*a   The children protected*

76   The Convention applies to children of less than sixteen years of age, who were 'habitually resident in a Contracting State immediately before any breach of custody or access rights'. As regards the requirement that they be habitually resident, reference must again be made to those considerations previously expressed about the nature of the Convention, which lead to the conclusion that a convention

---

[30] *Cf.* Doc. trav. No 2 (*Proposal of the United Kingdom delegation*) et les débats sur ce point aux P.-v. Nos 3 et 13.

[30] *Cf.* Working Document No 2 (*Proposal of the United Kingdom delegation*) and the debate on this point in *P.-v.* Nos 3 and 13.

---

*Rapport Pérez-Vera*

*Pérez-Vera Report*

autorités ne peut atteindre toute son efficacité que si les rapports visés se produisent entre Etats contractants.

77  L'âge limite pour l'application de la Convention soulève deux questions importantes. La première, la question de l'âge *stricto sensu*, a été à peine débattue. La Convention retient l'âge de seize ans, consacrant ainsi une notion d'enfant plus restrictive que celle admise par d'autres Conventions de La Haye.[31] La raison découle des objectifs conventionnels eux-mêmes; en effet, une personne de plus de seize ans a en général une volonté propre qui pourra difficilement être ignorée, soit par l'un ou l'autre de ses parents, soit par une autorité judiciaire ou administrative.

Quant à la détermination du moment où cet âge interdit l'application de la Convention, celle-ci, parmi les diverses options possibles, retient la plus limitative; en conséquence, aucune action ou décision basée sur les dispositions conventionnelles ne peut être adoptée à l'égard d'un enfant après son seizième anniversaire.

78  Le deuxième problème a trait à la situation des enfants âgés de moins de seize ans qui ont le droit de fixer leur lieu de résidence. Compte tenu du fait que ce droit fait en général partie du droit de garde, une proposition a été faite dans le sens de la non-application de la Convention dans de tels cas.[32] Cependant, cette proposition a été rejetée sur la base de divers arguments, parmi lesquels on peut citer: 1) la difficulté de choisir le système juridique qui devrait consacrer l'existence d'une telle possibilité, étant donné qu'il existe au moins trois possibilités qui sont, respectivement, la loi nationale, la loi de la résidence habituelle avant le déplacement et la loi de l'Etat de refuge; 2) la limitation excessive que cette proposition apporterait au domaine d'application de la Convention, par rapport notamment au droit de visite; 3) le fait que la faculté de décider du lieu de résidence d'un enfant n'est qu'un élément possible du droit de garde qui n'en épuise pas le contenu.

D'autre part, la décision prise à cet égard ne peut pas être isolée de la disposition de l'article 13, alinéa 2, qui donne la possibilité aux autorités compétentes de tenir compte de l'opinion de l'enfant sur son retour, dès qu'il atteint un âge et une maturité suffisants; en effet, cette norme permettra aux autorités judiciaires ou administratives, quand il sera question du retour d'un mineur ayant capacité de décider sur son lieu de résidence, de considérer que l'opinion de l'enfant est toujours déterminante. On peut arriver ainsi à l'application automatique d'une disposition facultative de la Convention, mais une telle conséquence semble préférable à la réduction globale du domaine d'application de la Convention.

### b  *Les titulaires des droits de garde et de visite*

79  Les problèmes soulevés à cet égard par l'un et l'autre des droits visés sont nettement différents. D'abord, en ce qui concerne le droit de visite, il est évident que par la nature même des choses, ses titulaires seront toujours des personnes physiques, dont la détermination dépendra de la loi appliquée à l'organisation de ce droit. En principe, ces personnes appartiendront à la proche famille de l'enfant, et il s'agira normalement soit du père, soit de la mère.

based on co-operation among authorities can only become fully operational after the relationships envisaged come into existence as among Contracting States.

77  The age limit for application of the Convention raises two important questions. Firstly, the matter of age in the strict sense gave rise to virtually no dispute. The Convention kept the age at sixteen, and therefore held to a concept of 'the child' which is more restrictive than that accepted by other Hague Conventions.[31] The reason for this derives from the objects of the Convention themselves; indeed, a person of more than sixteen years of age generally has a mind of his own which cannot easily be ignored either by one or both of his parents, or by a judicial or administrative authority.

As for deciding upon the point at which this age should exclude the Convention's application, the most restrictive of the various options available was retained by the Convention. Consequently, no action or decision based upon the Convention's provisions can be taken with regard to a child after its sixteenth birthday.

78  The second problem deals with the situation of children under sixteen years of age who have the right to choose their own place of residence. Considering that this right to choose one's residence generally forms part of the right to custody, a proposal was put forward to the effect that the Convention should not apply in such cases.[32] However, this proposal was rejected on various grounds, *inter alia* the following: (1) the difficulty of choosing the legal system which should determine whether such a possibility exists, since there are at least three different laws which could be applicable, namely, national law, the law of habitual residence prior to the child's removal, and the law of the State of refuge; (2) the excessive restriction which this proposal would place upon the scope of the Convention, particularly with regard to access rights; (3) the fact that the right to decide a child's place of residence is only one possible element of the right to custody which does not itself deprive it of all content.

On the other hand, the decision taken in this regard cannot be isolated from the provision in article 13, second paragraph, which allows the competent authorities to have regard to the opinion of the child as to its return, once it has reached an appropriate age and degree of maturity. Indeed, this rule leaves it open to judicial or administrative authorities, whenever they are faced with the possibility of returning a minor legally entitled to decide on his place of residence, to take the view that the opinion of the child should always be the decisive factor. The point could therefore be reached where an optional provision of the Convention becomes automatically applicable, but such a result seems preferable to an overall reduction in the Convention's scope.

### b  *The holders of custody and access rights*

79  The problems raised by both of these rights in this regard are quite different. Firstly, as regards access rights, it is obvious, by the very nature of things, that they will always be held by individuals, whose identity will depend on the law which applies to the organizing of these rights. These persons will as a rule be close relatives of the child, and normally will be either its father or mother.

---

[31]  Par exemple: *Convention sur la loi applicable aux obligations alimentaires envers les enfants, du 24 octobre 1956* (article premier); *Convention concernant la reconnaissance et l'exécution des décisions en matière d'obligations alimentaires envers les enfants, du 15 avril 1958* (article premier); *Convention concernant la compétence des autorités et la loi applicable en matière de protection des mineurs, du 5 octobre 1961* (article 12); *Convention concernant la compétence des autorités, la loi applicable et la reconnaissance des décisions en matière d'adoption, du 15 novembre 1965* (article premier).

[32]  *Cf.* Doc. trav. No 4 (Proposition de la délégation belge) et P.-v. No 4.

[31]  For example: *Convention of 24 October 1956 on the Law Applicable to Maintenance Obligations in Respect of Children* (article 1); *Convention of 15 April 1958 on the Recognition and Enforcement of Decisions Relating to Maintenance Obligations in Respect of Children* (article 1); *Convention of 5 October 1961 Concerning the Powers of Authorities and the Law Applicable in Respect of the Protection of Minors* (article 12); *Convention of 15 November 1965 on Jurisdiction, Applicable Law and Recognition of Decisions Relating to Adoptions* (article 1).

[32]  *Cf.* Working Document No 4 (*Proposition de la délégation belge*) and *P.-v.* No 4.

80  Par contre, des personnes morales peuvent aussi être titulaires d'un droit de garde, au sens de la Convention. A cet égard, l'article 3 considère la possibilité de l'attribution du droit de garde à «une institution ou tout autre organisme», en utilisant sciemment une expression vague et large. En effet, au cours de la Quatorzième session, l'inclusion dans le domaine conventionnel des hypothèses où la personne de l'enfant est confiée à une institution a été acceptée sans débats. Or, étant donné qu'il y a des organismes autres que les institutions qui ont à leur charge les soins de certains enfants, on a élargi l'expression utilisée pour y faire rentrer aussi bien les organismes ayant une personnalité juridique que ceux qui sont liés à l'organisation étatique et dépourvus d'une personnalité indépendante.

80  On the other hand, legal persons can also, in terms of the Convention, hold rights of custody. Article 3 envisages the possibility of custody rights being attributed to 'an institution or any other body', and is expressed in deliberately vague and wide terms. In fact, during the Fourteenth Session, the inclusion within the scope of the Convention of situations in which the child is entrusted to an institution was not challenged. Now, since there are bodies other than institutions which have children in their care, the term used was extended so as to apply equally to those bodies with legal personality and to those which, as an arm of the State, lack separate personality.

c  Les éventuels «enleveurs»

c  The potential 'abductors'

81  La Convention ne contient aucune disposition expresse à ce propos. Néanmoins, de l'ensemble du texte, nous pouvons déduire deux remarques qui éclairent cet aspect relatif au domaine d'application ratione personae de la Convention. La première concerne les personnes physiques qui peuvent être responsables du déplacement ou du non-retour d'un enfant. Sur ce sujet, la Convention maintient le point de vue adopté par la Commission spéciale de ne pas attribuer de telles actions exclusivement à des parents.[33] L'idée de famille étant plus ou moins large selon les différentes conceptions culturelles, il est préférable de s'en tenir à une vue large qui permette, par exemple, de qualifier d'enlèvement d'enfant, au sens de la Convention, les déplacements faits par un grand-père ou un père adoptif.

81  The Convention contains no express provision on this matter. Nevertheless, two comments may be drawn from the text as a whole, which shed light upon this question in relation to the Convention's scope ratione personae. The first concerns the physical persons who may be responsible for the removal or retention of a child. On this, the Convention upholds the point of view adopted by the Special Commission by not attributing such acts exclusively to one of the parents.[33] Since the idea of 'family' was more or less wide, depending on the different cultural conceptions which surround it, it was felt better to hold a wide view which would, for example, allow removals by a grandfather or adoptive father to be characterized as child abduction, in accordance with the Convention's use of that term.

82  La deuxième remarque a trait à la possibilité de ce qu'une «institution ou tout autre organisme» agisse comme «enleveur». A cet égard, il est difficilement imaginable qu'un organisme quelconque puisse déplacer, par la force ou par la ruse, un enfant d'un pays étranger vers son propre pays. D'autre part, si un enfant a été confié, par une décision judiciaire ou administrative (c'est-à-dire, au cas d'un placement forcé de l'enfant), à un tel organisme dans le pays de sa résidence habituelle, le parent qui prétend obtenir la jouissance effective d'un droit de garde sur celui-ci aura peu de chance de pouvoir invoquer la Convention. En effet, du fait que les organismes visés exercent en principe leurs compétences, abstraction faite de l'éventuelle reconnaissance de l'autorité parentale,[34] une telle prétention ne rentrerait pas dans le domaine conventionnel, puisque la garde au sens de la Convention appartiendrait à l'organisme en question.

82  The second comment relates to the possibility of an 'institution or any other body' acting as an 'abductor'. In this regard, it is difficult to imagine how any body whatever could remove, either by force or by deception, a child from a foreign country to its own land. On the other hand, if a child were entrusted, by virtue of a judicial or administrative decision (i.e. compulsory placement of the child) to such a body in the country of its habitual residence, the parent who sought to obtain the actual enjoyment of custody rights would stand little chance of being able to invoke the provisions of the Convention. In fact, by virtue of the fact that such bodies would as a rule exercise jurisdiction, except as regards the possible recognition of parental authority,[34] such a claim would not come within the scope of the Convention, since custody, in the sense understood by the Convention, would belong to the body in question.

Article 5 — De certaines expressions utilisées dans la Convention

Article 5 — Certain terms used in the Convention

83  Suivant une tradition bien établie de la Conférence de La Haye, la Convention ne définit pas les concepts juridiques dont elle se sert. Pourtant, dans cet article, elle précise le sens dans lequel sont utilisées les notions de droit de garde et de droit de visite, étant donné qu'une interprétation incorrecte de leur portée risquerait de compromettre les objectifs conventionnels.

83  The Convention, following a long-established tradition of the Hague Conference, does not define the legal concepts used by it. However, in this article, it does make clear the sense in which the notions of custody and access rights are used, since an incorrect interpretation of their meaning would risk compromising the Convention's objects.

84  En ce qui concerne le droit de garde, la Convention se limite à souligner qu'il comprend «le droit portant sur les soins de la personne de l'enfant», en marge des mécanismes

84  As regards custody rights, the Convention merely emphasizes the fact that it includes in the term 'rights relating to the care of the person of the child', leaving aside the

---

[33] Une approche plus restrictive se trouvait initialement dans le Rapport Dyer, cité supra, intitulé Rapport sur l'enlèvement international d'un enfant par un de ses parents.
[34] Voir sur ce point, Cour internationale de Justice, Arrêt du 28 novembre 1958, Affaire relative à l'application de la Convention de 1902 pour régler la tutelle des mineurs, Recueil des arrêts 1958, p. 55 et suiv.

[33] A more restrictive approach was to be found initially in the Dyer Report, referred to above, entitled Report on international child abduction by one parent.
[34] See the Judgment of the International Court of Justice, dated 28 November 1958, on the case concerning the application of the Convention of 1902 for regulating the guardianship of minors, ICJ Reports 1958, p. 55 et seq.

---

possibles de protection de ses biens. Il s'agit donc d'une notion plus restrictive que celle de «protection des mineurs»,[35] malgré les tentatives faites au cours de la Quatorzième session pour introduire l'idée de «protection», en vue surtout de couvrir les cas des enfants confiés à des institutions ou organismes. Mais, tous les efforts faits pour préciser la notion de droit de garde par rapport à ces situations ayant échoué, il faut s'en tenir au concept générique mentionné ci-dessus. La Convention essaie de le préciser en mettant en relief, comme indice des «biens» dont il s'agit, le droit de décider du lieu de résidence de l'enfant. Cependant, lorsque l'enfant, quoique mineur du point de vue juridique, a la faculté de fixer lui-même son lieu de résidence, le contenu du droit de garde sera déterminé en fonction des autres droits portant sur sa personne.

D'autre part, bien que dans cet article rien ne soit dit sur la possibilité que la garde soit exercée par son titulaire seul ou conjointement, il est évident que cette possibilité est envisagée. En effet, une règle classique du droit des traités exige que l'interprétation de ses termes soit effectuée dans son contexte et en tenant compte de l'objet et du but du traité;[36] or, la teneur de l'article 3 ne laisse pas de doute sur l'inclusion de la garde conjointe parmi les situations que la Convention entend protéger. Quant à savoir quand existe une garde conjointe, c'est une question qui doit être déterminée dans chaque cas d'espèce à la lumière du droit de la résidence habituelle de l'enfant.

85   Quant au droit de visite, la lettre *b* de cet article se limite à signaler qu'il comprend «le droit d'emmener l'enfant pour une période limitée dans un lieu autre que celui de sa résidence habituelle». L'intention de la Convention n'est évidemment pas d'exclure toutes les autres modalités du droit de visite; plus simplement, elle a voulu souligner que cette notion s'étend aussi au droit dit d'hébergement, manifestation du droit de visite que la personne qui a la garde de l'enfant redoute spécialement. De plus, étant donné que cette norme explicative ne qualifie point ce «lieu autre» où l'enfant peut être emmené, il faut conclure que le droit de visite, selon la Convention, inclut également le droit de visite transfrontière.

86   Une proposition a été faite en vue d'inclure dans cet article une définition des autorités judiciaires ou administratives visées tout au long des normes conventionnelles.[37] Les difficultés rencontrées tant pour la localisation d'un point de vue systématique que pour trouver une rédaction large qui englobe toutes les hypothèses possibles ont conseillé sa non-inclusion. Or il est clair qu'il s'agit, comme nous l'avons déjà souligné,[38] des autorités compétentes pour décider soit de la garde, soit de la protection des enfants, d'après la loi interne de chaque Etat contractant. D'ailleurs, c'est justement en raison des différences entre ces lois que l'on parle toujours des autorités «judiciaires ou administratives», en vue de recouvrir toutes les autorités ayant compétence en la matière, sans égard à la qualification juridique qu'elles reçoivent dans chaque Etat.

CHAPITRE II — AUTORITÉS CENTRALES

*Article 6 — Création des Autorités centrales*

87   Le rôle joué par les Autorités centrales, pièces clés dans

possible ways of protecting the child's property. It is therefore a more limited concept than that of 'protection of minors',[35] despite attempts made during the Fourteenth Session to introduce the idea of 'protection' so as to include in particular those cases where children are entrusted to institutions or bodies. But since all efforts to define custody rights in regard to those particular situations failed, one has to rest content with the general description given above. The Convention seeks to be more precise by emphasizing, as an example of the 'care' referred to, the right to determine the child's place of residence. However, if the child, although still a minor at law, has the right itself to determine its own place of residence, the substance of the custody rights will have to be determined in the context of other rights concerning the person of the child.

On the other hand, although nothing is said in this article about the possibility of custody rights being exercised singly or jointly, such a possibility is clearly envisaged. In fact, a classic rule of treaty law requires that a treaty's terms be interpreted in their context and by taking into account the objective and end sought by the treaty,[36] and the whole tenor of article 3 leaves no room for doubt that the Convention seeks to protect joint custody as well. As for knowing when joint custody exists, that is a question which must be decided in each particular case, and in the light of the law of the child's habitual residence.

85   As regards access rights, sub-paragraph *b* of this article merely points out that they include 'the right to take a child for a limited period of time to a place other than the child's habitual residence'. Clearly, therefore, it is not intended that the Convention exclude all other ways of exercising access rights. Quite simply, it seeks to emphasize that access rights extend also to what is called 'residential access', that aspect of access rights about which the person who has custody of the child is particularly apprehensive. Moreover, since this explanatory provision in no way qualifies this 'other place' to which the child may be taken, one must conclude that access rights, in terms of the Convention, also include the right of access across national frontiers.

86   A proposal was made to include in this article a definition of the judicial or administrative authorities mentioned throughout the Convention's rules.[37] The difficulties encountered as much in reaching a systematic viewpoint on this as in devising a definition wide enough to encompass all possible contingencies made for its exclusion. Now, as was mentioned earlier,[38] it is clear that these are the authorities who have the power, according to the internal law of each Contracting State, to determine questions concerning a child's custody or protection. Besides, it is precisely because of differences amongst these laws that reference is always made to 'judicial or administrative' authorities, so as to embrace all authorities which have jurisdiction in the matter, without regard to their legal characterization in each State.

CHAPTER II — CENTRAL AUTHORITIES

*Article 6 — Creation of Central Authorities*

87   The role played by the Central Authorities, crucial

---

[35] Voir par exemple la *Convention concernant la compétence des autorités et la loi applicable en matière de protection des mineurs, du 5 octobre 1961.*
[36] En ce sens, l'article 31, alinéa premier, de la Convention de Vienne sur le droit des traités du 23 mai 1969.
[37] Voir Doc. trav. No 7 (*Proposal of the United States delegation*) et P.-v. Nos 4 et 14.

[38] Voir *supra* No 45.

[35] See, for example, the *Convention of 5 October 1961 concerning the powers of authorities and the applicable law in respect of the protection of minors.*
[36] See article 31(1) of the Vienna Convention of 23 May 1969 on the law of treaties.
[37] See Working Document No 7 (Proposal of the United States delegation) and *P.-v.* Nos 4 and 14.
[38] See *supra*, No 45.

l'application de la Convention, a déjà été longuement présenté[39]

En ce qui concerne les Etats susceptibles de désigner plus d'une Autorité centrale, c'est l'idée que le critère déterminant à cet effet devait être l'existence de plusieurs organisations territoriales en matière de protection des mineurs qui a prévalu. En conséquence, on a ajouté aux hypothèses des Etats fédéraux et plurilégislatifs le cas des Etats «ayant des organisations territoriales autonomes», expression qui doit être interprétée dans un sens large.

*Article 7 — Obligations des Autorités centrales*

88    Cet article résume le rôle des Autorités centrales dans la mise en oeuvre du système instauré par la Convention. L'article est structuré en deux alinéas, dont le premier, rédigé en termes généraux, établit une obligation globale de coopération, tandis que le second énumère, de la lettre *a* à la lettre *i*, quelques-unes des principales fonctions que les Autorités centrales doivent remplir. Tous deux sont le résultat du compromis entre, d'une part les délégations qui désiraient des Autorités centrales fortes avec des compétences d'action et d'initiative amples et d'autre part les délégations qui envisageaient lesdites Autorités comme de simples mécanismes administratifs pour faciliter l'action des parties. Or, puisque ces diverses attitudes reflétaient la plupart des profondes différences existant entre les systèmes représentés à la Conférence, la solution à retenir devait être souple, de manière à permettre à chaque Autorité centrale d'agir selon le droit dans lequel elle est appelée à s'insérer. Donc, bien que la Convention précise les principales obligations confiées à la charge des Autorités centrales, elle laisse à chaque Etat contractant la détermination des mesures appropriées pour les exécuter. D'ailleurs, c'est dans ce sens qu'il faut interpréter la phrase qui introduit le second alinéa, et qui spécifie que les Autorités centrales doivent remplir les fonctions énumérées «soit directement, soit avec le concours de tout intermédiaire»; c'est à chaque Autorité centrale de choisir entre l'une ou l'autre option en fonction de son propre droit interne et dans l'esprit du devoir général de coopération que lui impose le premier alinéa.

89    Comme nous venons de le dire, la norme insérée dans le *premier alinéa* énonce l'obligation générale de coopérer des Autorités centrales, en vue d'assurer l'accomplissement des objectifs de la Convention. Une telle coopération doit se développer à deux niveaux: les Autorités centrales doivent d'abord coopérer entre elles; mais, de surcroît, elles doivent promouvoir la collaboration entre les autorités compétentes pour les matières visées dans leurs Etats respectifs. La réalisation effective de cette promotion dépendra dans une large mesure de la capacité d'action que chaque droit interne accorde aux Autorités centrales.

90    Les fonctions détaillées au *deuxième alinéa* essaient de suivre, dans leurs grandes lignes, les différents stades de l'intervention des Autorités centrales dans un cas type de déplacements d'enfants. Néanmoins, il est évident que cette énumération n'est pas exhaustive; par exemple, puisque l'intervention des Autorités centrales exige qu'elles aient été saisies au préalable, soit directement par le demandeur, soit par l'Autorité centrale, d'un autre Etat contractant, dans la seconde hypothèse, l'Autorité centrale initialement saisie de

factors as they are in the application of the Convention, has already been dealt with at length.[39]

As for those States which may appoint more than one Central Authority, the idea which prevailed was that the determining factor should be the existence of several territorial organizations for the protection of minors. Thus there was added to those cases of Federal States and States with more than one system of law that of States 'having autonomous territorial organizations', a term which is to be interpreted broadly.

*Article 7 — Obligations of Central Authorities*

88    This article summarizes the role played by Central Authorities in bringing into play the system established by the Convention. The article is structured in two paragraphs, the first of which, drafted in general terms, sets out an overall duty of co-operation, while the second lists, from sub-paragraphs *a* to *i*, some of the principal functions which the Central Authorities have to discharge. Both result from a compromise between, on the one hand, those delegations which wanted strong Central Authorities with wide-ranging powers of action and initiative, and on the other hand those which saw these Authorities as straightforward administrative mechanisms for promoting action by the parties. Now, since these diverse attitudes reflected most of the deep differences which existed amongst the systems represented at the Conference, the ultimate solution had to be flexible, and such as would allow each Central Authority to act according to the law within which it has to operate. Therefore, although the Convention clearly sets out the principal obligations laid upon the Central Authorities, it lets each Contracting State decide upon the appropriate means for discharging them. And it is in this sense that the sentence occurring at the beginning of the second paragraph must be understood, which states that the Central Authorities are to discharge their listed functions 'either directly, or through any intermediary'. It is for each Central Authority to choose one or the other options, while working within the context of its own internal law and within the spirit of the general duty of co-operation imposed upon it by the first paragraph.

89    As we have just said, the rule in the *first paragraph* sets out the general duty of Central Authorities to co-operate, so as to ensure the Convention's objects are achieved. Such co-operation has to develop on two levels: the Central Authorities must firstly co-operate with each other; however, in addition, they must promote co-operation among the authorities competent for the matters dealt with within their respective States. Whether this co-operation is promoted effectively will depend to a large extent on the freedom of action which each internal law confers upon the Central Authorities.

90    The functions listed in the *second paragraph* seek to trace, in broad outline, the different stages of intervention by Central Authorities in the typical case of child removal. Nonetheless, it is clear that this list is not exhaustive. For example, since the intervention of Central Authorities necessarily depends on their having been initially seized of the matter, either directly by the applicant or by the Central Authority of a Contracting State, then in the latter case the Central Authority initially seized will have to send the

---

[39] Voir *supra* Nos 43 à 48.

[39] See *supra*, Nos 43 to 48.

---

l'affaire devra transmettre la demande à l'Autorité centrale de l'État où l'on suppose que l'enfant se trouve. Or, cette obligation n'est pas précisée à l'article 7, mais plus tard, dans le contexte de l'article 9. D'autre part, il est évident aussi que les Autorités centrales ne sont pas tenues de remplir, dans chaque cas d'espèce, toutes les obligations énumérées dans cet article; en effet, ce sont les circonstances du cas précis qui vont déterminer les démarches à faire par les Autorités centrales: par exemple, on ne peut pas soutenir qu'une Autorité centrale quelconque soit tenue de «localiser» l'enfant quand le demandeur sait avec exactitude où se trouve celui-ci.

91  En plus de la localisation de l'enfant, chaque fois que cela s'avère nécessaire (lettre a), l'Autorité centrale doit prendre ou faire prendre toute mesure provisoire qui semble utile pour prévenir de «nouveaux dangers pour l'enfant ou des préjudices pour les parties concernées» (lettre b). La rédaction de ce sous-alinéa met à nouveau en relief un fait souligné auparavant: la capacité d'agir des Autorités centrales peut varier d'un État à un autre. Quant au fond, les mesures provisoires qui ont été envisagées se centrent tout particulièrement sur l'idée d'éviter un nouveau déplacement de l'enfant.

92  La lettre c consacre le devoir des Autorités centrales d'essayer de trouver une solution extrajudiciaire à l'affaire. En effet, d'après l'expérience évoquée par certains délégués, le nombre de cas qu'il est possible de résoudre sans avoir besoin de recourir aux tribunaux est considérable. Mais, encore une fois, c'est l'Autorité centrale qui, dans ces étapes précédant une éventuelle procédure judiciaire ou administrative, dirige l'évolution du problème; donc c'est à elle de décider à quel moment les tentatives faites, soit pour assurer la «remise volontaire» de l'enfant, soit pour faciliter une «solution amiable», ont échouées.

93  La lettre d porte sur les échanges d'informations relatives à la situation sociale de l'enfant. L'obligation à cet effet est subordonnée au critère des Autorités centrales impliquées dans chaque cas d'espèce. En effet, l'introduction du membre de phrase «si cela s'avère utile» montre que l'on n'a pas voulu imposer une obligation rigide sur ce point: la possibilité qu'il n'existe pas d'informations à fournir, ainsi que la peur qu'elles puissent être employées dans le cadre d'une tactique dilatoire des parties, sont quelques-uns des arguments qui ont conseillé cette attitude. D'autre part, on a rejeté une proposition rendant possible que certaines informations soient transmises à condition qu'elles restent confidentielles.[40]

94  L'obligation faite aux Autorités centrales de fournir des informations sur le contenu du droit dans leur État pour l'application de la Convention apparaît à la lettre e. Ce devoir couvre notamment deux aspects: d'une part dans le cas où le déplacement s'est produit avant qu'il n'y ait eu une décision sur la garde de l'enfant, l'Autorité centrale de l'État de la résidence habituelle de l'enfant pourra produire une attestation sur le contenu du droit de cet État, en vue de l'application de la Convention; d'autre part, l'Autorité centrale devra renseigner les particuliers sur le fonctionnement de la Convention et des Autorités centrales, ainsi que sur les procédures possibles à suivre. Par contre, la possibilité d'aller plus loin, c'est-à-dire d'obliger les Autorités centrales à donner des conseils juridiques sur des cas concrets, n'est pas envisagée dans cette norme.

application to the Central Authority of the State in which the child is thought to be. Now, this obligation is not spelled out in article 7, but later, in the context of article 9. On the other hand, it is also clear that the Central Authorities are not obliged to fulfil, in every specific case, all the duties listed in this article. In fact, the circumstances of each particular case will dictate the steps which are to be taken by the Central Authorities; for example, it cannot be maintained that every Central Authority must discover the whereabouts of a child when the applicant knows full well where it is.

91  In addition to finding the whereabouts of the child, where necessary (sub-paragraph a), the Central Authority must take or cause to be taken any provisional measures which could help prevent 'further harm to the child or prejudice to interested parties' (sub-paragraph b). The drafting of this sub-paragraph clearly brings out once again a fact which was emphasized above, namely, that the ability of Central Authorities to act will vary from one State to another. Basically, the provisional measures envisaged are designed in particular to avoid another removal of the child.

92  Sub-paragraph c sets out the duty of Central Authorities to try to find an extrajudicial solution. In actual fact, in the light of experience as spoken to by some delegates, a considerable number of cases can be settled without any need to have recourse to the courts. But, once again, it is the Central Authorities which, in those stages preceding the possible judicial or administrative proceedings, will direct the development of the problem; it is therefore for them to decide when the attempts to secure the 'voluntary return' of the child or to bring about an 'amicable resolution', have failed.

93  Sub-paragraph d relates to the exchange of information about the social background of the child. This duty is made subject to the criteria adopted by the Central Authorities involved in a particular case. Indeed, the insertion of the phrase 'where desirable' demonstrates that there is no wish to impose an inflexible obligation here: the possibility of there being no information to provide, as well as the fear that reference to this provision might be used by the parties as a delaying tactic, are some of the arguments which prompted this approach. On the other hand, a proposal which would have made the transmission of certain information conditional upon its remaining confidential, was rejected.[40]

94  The obligation laid upon Central Authorities to provide information on the content of the law in their own States for the application of the Convention appears in sub-paragraph e. This duty applies in particular to two situations. Firstly, where the removal occurs prior to any decision as to the custody of the child, the Central Authority of the State of the child's habitual residence is to produce, for the purposes of the Convention's application, a certificate on the relevant law of that State. Secondly, the Central Authority must inform the individuals about how the Convention works and about the Central Authorities, as well as about the procedures available. On the other hand, the possibility of going further, by obliging the Central Authorities to give legal advice in individual cases, is not envisaged by this rule.

---

[40]  Voir Doc. trav. No 9 (*Proposal of the United Kingdom delegation*) et P.-v. No 5.

[40]  See Working Document No 9 (Proposal of the United Kingdom delegation) and *P.-v.* No 5.